**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re:<br><br>DAUFUSKIE ISLAND PROPERTIES, LLC,<br><br>                                        Debtor. | C/A No. 09-00389-JW<br><br>Chapter 11 |
| The Melrose Club, Inc.,<br><br>                                        Plaintiff,<br><br>v.<br><br>Robert C. Onorato, in his capacity as Chapter 11 Trustee for the Estate of Daufuskie Island Properties, LLC; Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989; William R. Dixon, Jr. and Gayle Bulls Dixon; AFG, LLC; Carolina Shores, LLC; Beach First National Bancshares, Inc. d/b/a Beach First National Bank; Beach Cottages II, LLC; Pensco Trust Company, Inc.; The Beach Cottages, LLC; The Greenery, Inc.; Coastal Connections, Inc.; Beach Cottages III, LLC; Easter Beach Villas, LLC; and Ocean Front Villas, LLC,<br><br>                                        Defendants. | Adv. Pro. No. 09-80094-JW<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**<br><br><br><br>OCT 3 0 2009<br><br>United States Bankruptcy Court<br>Columbia, South Carolina (25) |
| The Melrose Club, Inc.,<br><br>                                        Plaintiff,<br><br>v.<br><br>DAUFUSKIE ISLAND PROPERTIES, LLC; William R. Dixon, Jr.; Gayle Bulls Dixon; Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989,<br><br>                                        Defendants,<br><br>of whom Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989, is<br><br>                                        Third Party Plaintiff,<br><br>v.<br><br>William R. Dixon, Jr.,<br><br>                                        Third Party Defendant. | **ENTERED**<br><br>OCT 3 0 2009<br><br>**C.H.B.** |

This matter comes before the Court on the motions to dismiss or alternatively for judgment on the pleadings or summary judgment, and joinders therein (collectively, the "Motions") filed by AFG, LLC; Beach First National Bancshares, Inc.; Carolina Shores, LLC, Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989; William R. Dixon, Jr. and Gayle Bulls Dixon; Beach Cottages II, LLC; Beach Cottages III, LLC; and Robert C. Onorato, in his capacity as Chapter 11 Trustee for the Estate of Daufuskie Island Properties, LLC (collectively, the "Moving Defendants").

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157. All parties who contend that this matter is not a core proceeding have consented, pursuant to 28 U.S.C. § 157(c)(2), to the Court's issuance of a final order pertaining to the Motions. Pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052, the Court makes the following Findings of Fact and Conclusions of Law.[1]

## FINDINGS OF FACT

1.  The Melrose Club, Inc., a South Carolina nonprofit mutual benefit corporation ("MCI"), previously owned approximately 300 acres on Daufuskie Island, which is located in Beaufort County, South Carolina (the "Property"). Improvements on the Property included, inter alia, the 52-room Melrose Inn, 37 Beach Cottages, Beach Club, golf and tennis club house, health and fitness center, equestrian center, Sportsman's Lodge, administration and maintenance facility, together with interests in the embarkation center at Salty Fare on Hilton Head Island with docks and parking, and debarkation center at Melrose Landing on Daufuskie Island.

2.  MCI conveyed the Property to Melrose Club Management, Inc. n/k/a Daufuskie Club, Inc. ("DCI") on or about December 30, 1996, by special warranty deed.

---

[1] To the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent that any Conclusions of Law constitute Findings of Fact, they are so adopted.

3. The details of the conveyance of the Property from MCI to DCI were set forth in a Transfer Agreement between the parties ("1996 Transfer Agreement" or the "Transfer Agreement").

4. The purchase price for the Property was DCI's payment of a $1,200,000.00 promissory note payable to Club Financial Corp.; assumption of MCI's liabilities, as defined in the Transfer Agreement; assumption of the Additional Obligations, as defined in the Transfer Agreement; and the issuance of Club Memberships pursuant to the terms in the Transfer Agreement.

5. Article 5 of the Transfer Agreement, entitled "Additional Obligations," provides as follows:

> 5.1 <u>Purchaser's Additional Obligations</u>. As additional consideration for the transfer and sale of the Assets, Purchaser agrees to execute, on the Closing Date, the Assignment and Assumption Agreement whereby Purchaser agrees to assume and fund the costs of the Additional Obligations pursuant to the terms and conditions recited therein. In the event Purchaser, at any time from the Closing Date to the expiration of twenty (20) years from the Closing Date, elects to not perform the Additional Obligations, or any material part thereof, then Purchaser shall provide written notice to Seller of its election (the "Written Notice"). Purchaser agrees to reconvey the Assets to Seller within thirty (30) days after the Written Notice has been received by Seller, if Seller, at its option in its sole discretion, notifies Purchaser, in writing within thirty (30) days after receipt of the Written Notice, that Seller agrees to accept such reconveyance. The closing of the reconveyance shall be in the same manner and the substantially same form of documentation as utilized for the Closing, and Seller shall assume all of the existing liabilities of Purchaser arising from its ownership and operation of the Assets, which liabilities shall not be greater than the Liabilities assumed by Purchaser at the Closing. Purchaser agrees, for a period of seven (7) years from the Closing Date, that any mortgage or security agreement against the Assets shall only secure funding for capital improvements, replacements, renovations, repairs, or the operation of the Club. The parties agree that a memorandum setting forth the reconveyance and debt restrictions set forth in this Section shall be recorded against the Real Property and shall be a covenant running with the land and be binding on any successor or assign of Purchaser who acquires the Real Property.

6. Exhibit A to the Second Amendment of the Transfer Agreement ("Exhibit A") defines "Additional Obligations" as including the following: (i) participation in and funding of a percentage of a beach renourishment project; (ii) funding of all operational deficits, as defined in Exhibit A, in connection with the operation of the Melrose Club facilities with no assessments to the Melrose Club members; (iii) renovation of the Beach Cottages; (iv) repairing and replacement of the golf course irrigation system, golf cart paths and sand traps; and (v) preparation of a business plan evaluation concerning the construction of a potential conference facility.

7. Exhibit A defines "Operational Deficits" as "gross receipts, minus . . . operational expenses as set forth on [DCI's] financial statements prepared in accordance with generally accepted accounting principles."

8. DCI thus granted MCI the right until 2016 to have the Property returned to MCI if DCI elected not to perform the Additional Obligations or any material part thereof. Article 5 states that the right is a covenant running with the land, binding on successors and assigns of DCI. DCI and MCI memorialized this right by executing a Memorandum of Agreement ("Memorandum"), which was recorded in the Beaufort County RMC Office on December 31, 1996, in Deed Book 911, at Page 1859.

9. Paragraph 1 of the recorded Memorandum provides:

> This Memorandum is executed and filed of record to evidence the terms of Article 5 of that certain Transfer Agreement (the "Agreement") executed on September 27, 1996, as amended, between Seller and Purchaser. The specific terms and conditions in Section 5 of the Agreement (the "Restrictions") are covenants running with the land described on <u>Schedule A</u> hereto (the "Property"). After the date hereof, the Property shall be held, sold, and conveyed subject to the terms of the Restrictions, which shall run with the title to the Property and shall bind all parties having any right, title, or interest in the Property or any part thereof, their heirs,

successors, successors-in-title, and assigns and shall inure to the benefit of Seller, unless released or terminate as provided.

Paragraph 2 of the recorded Memorandum sets forth the terms of the reconveyance right as laid out in Article 5.

10. The Transfer Agreement further provides:

> 14.1.6. <u>Subsequent Assignments of the Assets</u>. Notwithstanding anything in this Agreement to the contrary, Purchaser shall not, without Seller's express prior written consent, which consent will not unreasonably be withheld, transfer, or agree to transfer, in any manner, all or substantially all of the Assets, except to (i) any person whose net worth (determined in accordance with generally accepted accounting principles) is not at least as great as that of Purchaser immediately after the transfer of the Assets to Purchaser pursuant to this Agreement, and (ii) a person who has experience and a quality reputation in the club and resort industries. For all purposes of this Agreement, the term "person" shall be construed as broadly as possible and shall include, without limitation, any natural person, corporation, company, limited liability company, general partnership, limited partnership, limited liability partnership, unincorporated association, joint venture, sole proprietorship, business trust, or other entity, in each case whether or not for profit. Notwithstanding the above, Purchaser may sell portions of the Assets in the ordinary course of business, provided that the sale of said Assets do not materially impact the facilities provided to the Members or the operation of the Club.

11. Additionally, the Transfer Agreement includes a general provision concerning successors and assigns:

> 20.15. <u>Successors and Assigns</u>. This Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns whenever the context so requires or permits.

12. As set forth by MCI's Amended Complaint, DCI and Debtor entered into an agreement in 2002 for the transfer of assets previously transferred by MCI to DCI pursuant to the Transfer Agreement. As further set forth by MCI's Amended Complaint, on or about May 31, 2002, MCI executed an Estoppel Certificate at the request of DCI and Debtor, which provided

that MCI consented to the transfer to Debtor and that Debtor assumed the obligations under the Transfer Agreement.

13. Debtor is a limited liability company with two members: William R. Dixon, Jr. and his wife, Gayle Bulls Dixon. On January 20, 2009, Debtor filed a petition seeking relief under Chapter 11 of the Bankruptcy Code. On March 17, 2009 the Court's order appointing a Trustee in Debtor's bankruptcy case was entered.

14. On May 6, 2009, the Court memorialized its ruling on March 11, 2009, by entering an order denying Debtor's motion to reject the Transfer Agreement as an executory contract.

15. MCI filed its initial Complaint in this declaratory judgment action on June 15, 2009. With the consent of the Moving Defendants, MCI filed its Amended Complaint on August 21, 2009. In its Amended Complaint, MCI seeks a declaratory judgment finding that (1) Debtor has failed to fund the Operational Deficits, and thus, failed to perform the Additional Obligations under the Transfer Agreement; (2) such failure acts as an election not to perform the Additional Obligations; (3) MCI has the right to repurchase the Property subject to the terms of Article 5 of the Transfer Agreement; and (4) the Defendants' rights, title, and interests in this action are subject to MCI's rights. The Moving Defendants have all filed answers to the Amended Complaint.

16. Moving Defendants AFG, LLC ("AFG"); Beach First National Bancshares, Inc. ("Beach First"); Carolina Shores, LLC ("Carolina Shores"); William R. Dixon, Jr. ("Mr. Dixon"); and Beach Cottages III, LLC ("Beach III") each assert mortgage liens on portions of the Property involved in this declaratory judgment action.

17. Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins

Family Trust Dated May 26, 1989 ("CFT") is the record owner of the embarkation center Salty Fare on Hilton Head Island with docks and parking.

18. Beach Cottages II, LLC ("Beach II") is the record owner of certain cottages originally included in the Property as conveyed from MCI to DCI.

19. Each of the Moving Defendants obtained their interest in the Property subsequent to the recordation of the Memorandum.

## CONCLUSIONS OF LAW

The Moving Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012, or alternatively for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), also made applicable to this proceeding by Fed. R. Bankr. P. 7012, or alternatively for summary judgment pursuant to Fed. R. Civ. P. 56, made applicable to this proceeding by Fed. R. Bankr. P 7056. Because the Court has considered only the relevant pleadings and the exhibits attached thereto, the Court makes its decision on the basis of Fed. R. Civ. P. 12(b)(6).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Bell Atlantic, 550 U.S. at 556). Plausibility does not require probability, but does require something "more than a sheer possibility that a defendant has acted unlawfully." Id.

To reach the conclusion that MCI's claim to relief is not plausible, according to the arguments raised by the Moving Defendants, the Court must find (1) that MCI's asserted right is

7

not a covenant running with the land or, if it is such a covenant, it is not binding on the Debtor; (2) that if MCI's asserted right is a covenant binding on the Debtor, MCI has no standing to enforce the covenant; (3) that if MCI does have standing to enforce the covenant, permitting MCI to repurchase the Property as set forth in the Transfer Agreement would violate South Carolina public policy; or (4) that reconveyance of the Property would violate the warranty of title given to DCI by MCI.[2]

### I. THE PLEADINGS SUPPORT A FINDING THAT ARTICLE 5 AND THE MEMORANDUM MAY HAVE CREATED A REAL COVENANT RUNNING WITH THE LAND

The Moving Defendants assert that the repurchase rights contained in the Transfer Agreement, and set forth in the Memorandum, are not enforceable by MCI against the estate.

Under South Carolina law, a covenant is a real covenant that runs with the land and binds successors to the original covenantor if three elements are found: (i) an indication the covenanting parties intended the covenant to run with the land; (ii) the covenant touches and concerns the real property; and (iii) the party required to observe the covenant has actual or constructive notice of the covenant. In re T 2 Green, LLC, 363 B.R. 753, 766 (Bankr. D.S.C. 2006); Harbison Cmty. Ass'n v. Mueller, 319 S.C. 99, 102-03, 459 S.E.2d 860, 862-863 (Ct. App. 1995).

In considering the first element, the Court must construe the covenant "so as to carry into effect the intention of the parties, which is to be collected from the whole instrument and from the circumstances surrounding its execution." Cheves v. City Council of Charleston, 140 S.C. 423, 138 S.E. 867, 869 (1927); see also Midway Props., Inc. v. Pfister, 292 S.C. 104, 106, 354

---

[2] The Court notes that in their Motions, the Moving Defendants argued the debt restriction covenant of Article 5 applied for a period of seven years, or until December 2003, and the debts of Beach First and AFG were not incurred until 2008. The Court does not consider this issue in making its ruling herein since the Moving Defendants did not continue to assert this as a ground for granting their Motions in their proposed orders.

8

S.E.2d 926, 927 (Ct. App. 1987) (reviewing the instrument as a whole to discern the parties' intent, and finding the general rule of strict construction of restrictions is "not applicable if it will defeat the plain and obvious purpose of the restrictions"). The Court may look to the language of the covenant to determine whether the language used evidences an intention to attach the attribute of assignability. Cheves, 140 S.C. 423, 138 S.E. at 869; see also Gressette v. S.C. Elec. & Gas Co., 370 S.C. 377, 382-83, 635 S.E.2d 538, 541 (2006) (construing the language of an easement). The use of language indicating a covenant shall bind the "heirs and assigns" of a property owner is evidence of such intent. Id.

The plain language of the Memorandum and Transfer Agreement indicates an intention that the covenants therein described would run with the land and bind all parties having any right, title, or interest in the Property or any part thereof, their heirs, successors, successors-in-title, and assigns. The final sentence of Section 5.1 states that the Article 5 restrictions shall be binding on any successor or assign of the Purchaser who acquires the Property. Section 20.15 of the Transfer Agreement further states that its terms and provisions shall be binding on each of the parties' respective successors and assigns. The recorded Memorandum provides that "the Property shall be held, sold, and conveyed subject to the terms of the Restrictions, which shall run with the title to the Property and shall bind all parties having any right, title, or interest in the Property or any part thereof, their heirs, successors, successors-in-title, and assigns." Based on this language, the Court cannot find that the contracting parties did not intend for the covenant to run with the title to the land.

In determining whether the second element is satisfied, Epting v. Lexington Power Co., 177 S.C. 308, 181 S.E. 66 (1935), is instructive. The Epting Court distinguished personal covenants and convenants running with the land, stating "a covenant is personal when it has no

9

relation to the land conveyed . . . or is not connected with the title." 181 S.C. at 71. In contrast, to run with the land, a covenant "must relate to the realty demised, having for its object something annexed to, or inherent in, or connected with the land; that its performance or nonperformance must affect the nature, quality, value, or mode of enjoyment of the demised premises." Id.; see also T 2 Green, 363 B.R. at 766 (stating that a covenant touches and concerns land if "the covenantee's legal interest in land is rendered more valuable by the covenant's performance") (internal citation omitted).

The Moving Defendants, while agreeing that the Epting test applies, have failed to demonstrate that the provisions of Article 5 and the Memorandum will not "affect the nature, quality, value, or mode of enjoyment of the demised premises." See Epting, 181 S.E. at 71. The South Carolina Court of Appeals has held that "covenants that require grantees to pay assessments for the upkeep of a particular parcel of property are held to be real covenants which 'touch and concern' land, and therefore, run with the land." Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp., 368 S.C. 342, 361, 628 S.E.2d 902, 913 (Ct. App. 2006).

In this case, the Debtor has an obligation to fund Operational Deficits, which are defined under the Transfer Agreement as gross receipts minus operational expenses as determined under generally accepted accounting principle ("GAAP"). Operational expenses under GAAP include such things as taxes, insurance, repairs, and maintenance. Here, the covenant MCI seeks to enforce touches and concerns the Property by, among other things, requiring the covenantor to perform obligations which involve the maintenance and repair of the Property that relate to the "nature, quality, value, or mode of enjoyment of the demised premises."

Furthermore, Article 5 provides MCI a reconveyance right under certain circumstances at a structured price. These features of the agreement appear to impact the value of MCI's interest

10

in the Property.

The third element, notice, is not disputed. Debtor had constructive notice by way of the Memorandum, which was recorded in the chain of title, and the Estoppel Certificate establishes that Debtor had actual notice of the Transfer Agreement and Memorandum.

## II. THE TRANSFER AGREEMENT AND THE MEMORANDUM PROVIDE THAT SUCCESSORS AND ASSIGNS OF DCI ARE BOUND

The Moving Defendants argue that the Transfer Agreement's definition of "Purchaser" limited the obligation to fund Operational Deficits, and thus perform the Additional Obligations, to the duration of DCI's ownership of the Property. Specifically, the Moving Defendants argue that because the term Purchaser is defined in the Transfer Agreement as Daufuskie Club, Inc., f/k/a Melrose Club Management, Inc., the Additional Obligations that require action by the Purchaser do not apply to the Debtor. In support of their argument, the Moving Defendants point to the fact that the term Purchaser was originally defined to mean Melrose Club Management, Inc. ("MCMI"). When MCMI changed its corporate name to DCI, the parties then amended the definition of Purchaser to reflect that corporate name change. The Moving Defendants assert that this change evidences MCI's and DCI's recognition that the definition of Purchaser needed to be changed to reflect the proper name of the party to be bound.

As stated above, the plain language of the Transfer Agreement and Memorandum indicates that Article 5 was intended to run with the land and bind successors and assigns in interest. Furthermore, any construction of the Transfer Agreement must be consistent with the language used in the Transfer Agreement and lead to a construction that is reasonable, fair and just. Ward v. West Oil Co., 379 S.C. 225, 247, 665 S.E.2d 618, 630 (Ct. App. 2008) (stating that "where one construction makes the provisions unusual or extraordinary and another construction which is equally consistent with the language employed, would make it reasonable, fair and just,

11

the latter construction must prevail") (quoting C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988)).

The parties apparently took great care to include language in the Transfer Agreement and Memorandum binding DCI's successors and assigns, negating any argument that the intent was only to bind DCI. The Moving Defendants' construction of the Transfer Agreement would have the effect of writing the successors and assigns provisions out of the agreement, and such a construction also conflicts with the Estoppel Certificate, in which Debtor assumed DCI's obligations under the Transfer Agreement.

Thus, it appears to the Court that any remaining obligations under the Transfer Agreement, including the provisions of Article 5, are binding upon the Debtor as the successor and assign of DCI.

### III. MCI HAS STANDING TO ENFORCE ITS RIGHTS UNDER THE TRANSFER AGREEMENT

The Moving Defendants contend that even if the reconveyance provision is a restrictive covenant, MCI lacks standing to enforce it because MCI does not have a property interest. MCI argues the nature of its right is a property interest, and based on that property interest, it has standing to bring this action.

South Carolina courts have recognized standing by adjudicating claims for declaratory relief based on rights asserted under a contract. See Hardy v. Aiken, 369 S.C. 160, 166, 631 S.E.2d 539, 542 (2006) (stating that "[r]estrictive covenants are contractual in nature" and determining a declaratory judgment action with respect to the expiration of restrictive covenants); S.C. Elec. & Gas Co. v. Hartough, 375 S.C. 541, 547, 654 S.E.2d 87, 89-90 (Ct. App. 2007) (adjudicating a claim for declaratory relief that an option was valid and enforceable). Thus, the Court finds that MCI has standing pursuant to its rights under the Transfer Agreement,

and therefore, there is no need to determine conclusively at this time whether MCI's right to repurchase constitutes a property interest.

### IV. THE RECONVEYANCE RIGHT DOES NOT VIOLATE THE COVENANT OF WARRANTY OF TITLE GIVEN BY MCI IN ITS DEED TO DCI

The Moving Defendants assert MCI should have included the reconveyance covenant among the exceptions listed on Exhibit B to the Special Warranty Deed delivered by MCI to DCI. The Court disagrees and finds that this argument does not consider the structure of the agreement between MCI and DCI and the order in which the instruments were recorded in the Beaufort County RMC Office. The manner in which the parties executed their agreement indicates the parties intended to ensure implementation of the Transfer Agreement by recording the Memorandum after the deed was delivered from MCI to DCI. Accordingly, it was unnecessary for MCI to include the reconveyance covenant, which was not yet recorded, among the prior encumbrances excluded from the warranty of title granted. See Bennett v. Investors Title Ins. Co., 370 S.C. 578, 596-97, 635 S.E.2d 649, 658 (Ct. App. 2006) (stating that while a "special warranty binds the grantor and the grantor's heirs," a grantor can limit covenants "so as to exclude existing encumbrances").

### V. THE RECONVEYANCE PROVISION AND SOUTH CAROLINA PUBLIC POLICY

In support of their Motions, the Moving Defendants assert that MCI cannot be allowed to repurchase the Property for the amount capped at the liabilities as described in Article 5 of the Transfer Agreement. The Moving Defendants argue that to permit MCI's repurchase under such terms would violate South Carolina public policy. The Court cannot conclude at this pleading stage that the reconveyance provision contravenes public policy, and thus denies the Moving Defendants' Motions on their asserted public policy grounds.

The basis for the Moving Defendants' public policy argument is that allowing MCI to repurchase the Property would permit MCI to receive the benefit of the funds paid on its debt interest free for more than twelve years, as well as the benefit of all of the improvements, renovations, and maintenance of the Property, and the benefit of freely enjoying the use of the Property while DCI, and later the Debtor, paid for operations. The Moving Defendants assert that the amount expended on these items is in excess of $45 million, while the amount MCI would pay for repurchase of the Property may be a much lesser amount. The Moving Defendants assert that to enforce such an agreement would result in a penalty or forfeiture and is, therefore, unenforceable under South Carolina law.

The South Carolina Supreme Court has held that in certain circumstances, a change in a property's value alone will not allow a party to defeat restrictive covenants or the terms of a contract. See Buffington v. T.O.E. Enters., 383 S.C. 388, 393, 680 S.E.2d 289, 291 (2009) (finding that "it would be inequitable to consider [purchasers'] financial loss in purchasing and improving the land since they were on notice of the covenants when they purchased the property" and to find otherwise "would indicate that any business could defeat a restrictive covenant by spending a significant amount of money developing the land"); Adams v. Willis, 225 S.C. 518, 83 S.E.2d 171, 175 (1954) (stating that parties make their own contracts, and a change in value does not justify a refusal to grant specific performance of an option contract).

After reviewing these cases and the limited information available at this time and noting its restriction to an examination of the pleadings, the Court finds the Motions do not support a present finding that the reconveyance provision violates public policy.

## **CONCLUSION**

Based on the foregoing, the Court concludes that at this stage, MCI's complaint for

14

declaratory judgment is plausible. The Court has reviewed the complaint and attached exhibits, and the motions to dismiss and joinders thereto, and based on these pleadings, the Court cannot conclude that MCI does not have standing to assert the relief requested; that the right of reconveyance does not constitute a covenant running with the land, binding on Debtor and its successors; that the covenant violates public policy; or that the covenant violates the warranty deed from MCI to DCI. Therefore, after considering the Moving Defendants' Motions in the context of Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012, the Court denies the Motions.

A definitive determination of MCI's rights relative to the Property is the object of this adversary proceeding and has been the subject of prior state court cases and the earlier motion to reject an executory contract. Such a determination of MCI's rights remains critical to the Chapter 11 reorganization case and may affect the marketability and sale of the Debtor's primary assets.

The parties to the proceeding have indicated that motions for summary judgment may more effectively address this critical and necessary legal determination. To the extent that these parties agree upon the essential facts or agree that no issues of material fact remain, expedited consideration of cross-motions for summary judgment may be the best approach for addressing these issues.

**AND IT IS SO ORDERED.**

_____
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
October 30, 2009

15