## U.S. BANKRUPTCY COURT
District of South Carolina

Case Number: 09-00389

ADVERSARY PROCEEDING NO: 09-80094

## ORDER

The relief set forth on the following pages, for a total of 21 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**12/21/2009**



*(signature)* John E. Waites

Chief US Bankruptcy Court Judge
District of South Carolina

Entered: 12/21/2009

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

|  |  |
|---|---|
| In re:<br><br>DAUFUSKIE ISLAND PROPERTIES, LLC,<br><br>Debtor. | C/A No. 09-00389-JW<br><br>Chapter 11<br><br>Adv. Pro. No. 09-80094-JW |

The Melrose Club, Inc.,

Plaintiff,

v.

Robert C. Onorato, in his capacity as Chapter 11 Trustee for the Estate of Daufuskie Island Properties, LLC; Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989; William R. Dixon, Jr. and Gayle Bulls Dixon; AFG, LLC; Carolina Shores, LLC; Beach First National Bancshares, Inc. d/b/a Beach First National Bank; Beach Cottages II, LLC; Pensco Trust Company, Inc.; The Beach Cottages, LLC; The Greenery, Inc.; Coastal Connections, Inc.; Beach Cottages III, LLC; Easter Beach Villas, LLC; and Ocean Front Villas, LLC,

Defendants.

**ORDER**

The Melrose Club, Inc.,

Plaintiff,

v.

DAUFUSKIE ISLAND PROPERTIES, LLC; William R. Dixon, Jr.; Gayle Bulls Dixon; Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989,

Defendants,

of whom Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989, is

Third Party Plaintiff,

v.

William R. Dixon, Jr.,

Third Party Defendant.

This matter comes before the Court on the motions for summary judgment ("Motions") filed by Carolina Shores, LLC; The Melrose Club, Inc.; AFG, LLC and Beach First National Bancshares, Inc.; and the responses and objections filed thereto.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157.  All parties who contend that this matter is not a core proceeding have consented, pursuant to 28 U.S.C. § 157(c)(2), to the Court's issuance of a final order pertaining to the Motions.   Pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052, the Court makes the following Findings of Fact and Conclusions of Law.[1]

## FINDINGS OF FACT

### A.  The Parties

1.      The Melrose Club, Inc., a South Carolina nonprofit mutual benefit corporation ("MCI"), previously owned approximately 300 acres on Daufuskie Island, which is located in Beaufort County, South Carolina (the "Property").  Improvements on the Property included, inter alia, the 52-room Melrose Inn, 37 Beach Cottages, Beach Club, golf and tennis club house, health and fitness center, equestrian center, Sportsman's Lodge, administration and maintenance facility, together with interests in the embarkation center at Salty Fare on Hilton Head Island with docks and parking, and debarkation center at Melrose Landing on Daufuskie Island.

2.      Debtor, the current owner of the Property except as indicated below, is a limited liability company with two members: William R. Dixon, Jr. and his wife, Gayle Bulls Dixon (collectively the "Dixons").  On January 20, 2009, Debtor filed a petition seeking relief under Chapter 11 of the Bankruptcy Code.  On March 17, 2009, the Court ordered the appointment of a Trustee in Debtor's bankruptcy case.

---

[1] To the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent that any Conclusions of Law constitute Findings of Fact, they are so adopted.

3.      Beach First National Bancshares, Inc. d/b/a Beach First National Bank ("Beach First") holds a first priority lien on the assets of the bankruptcy estate to secure post-petition loans made to the Trustee in April, May, and July 2009. The principal amount of the loan, which is a participation loan with Tidelands Bank, is $1.5 million. Beach First has also filed a proof of claim in the amount of $6,417,614.42 based on a third mortgage and security interest on portions of the Property owned by Debtor.

4.      AFG, LLC ("AFG") has filed a proof of claim in the amount of $4 million based on a third mortgage and security interest on portions of the Property owned by Debtor.

5.      Carolina Shores, LLC ("Carolina Shores") has filed a proof of claim in the amount of $27,750,128.51 based on a junior mortgage and security interest, as assigned by the Club Financial Corp., on portions of the Property owned by Debtor.

6.      William Dixon, Jr. ("Bill Dixon") has also filed a proof of claim in the amount of $34,692,660.58 based on a mortgage and lien on portions of the Property owned by Debtor. The Trustee and Carolina Shores both dispute this claim in separate adversary proceedings, Adversary Proceeding No. 09-80120-jw and 09-80134-jw, respectively.

7.      Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989 ("CFT") is the record owner of the embarkation center Salty Fare on Hilton Head Island with docks and parking ("Salty Fare"), which was transferred to it by Debtor in April 2007. At the time of the transfer, CFT and Debtor entered into a commercial lease agreement providing for Debtor's continued use and maintenance of Salty Fare. On June 2, 2009, this Court entered an order authorizing the Trustee's rejection of the commercial lease agreement. The Dixons hold an option to purchase Salty Fare.

8.      Beach Cottages II, LLC ("Beach Cottages II") is the record owner of a portion of

the Property.  Beach Cottages II has filed a claim for $43,067.51 based on rental management revenue and an unauthorized loan made to Debtor in June 2008.

9.      Beach Cottages III, LLC ("Beach Cottages III") is the record owner of a portion of the Property.  Beach Cottages III has filed a claim for $781,935.31 based on rental management revenue and a series of promissory notes secured by the portion of Property owned by Beach Cottages II.

10.     The Beach Cottages, LLC ("Beach Cottages I") is the record owner of a portion of the Property.

11.     Pensco Trust Company, Inc. ("Pensco") was joined in this adversary as the holder of mortgages on the portion of Property owned by Beach Cottages III.  Pensco characterizes itself as a passive custodian on behalf of third-party individuals who hold the promissory notes.

12.     Easter Beach Villas, LLC ("Easter Beach") holds a mortgage on the portion of Property owned by Beach Cottages II.

13.     Ocean Front Villas, LLC ("Ocean Front") holds a mortgage on the portion of Property owned by Beach Cottages III.

14.     The Court entered orders of default as to The Greenery, Inc. ("The Greenery") and Coastal Connections, Inc. ("Coastal Connections") on August 6, 2009, and August 7, 2009, respectively.  The Greenery and Coastal Connections each filed a prepetition mechanics lien action on certain parcels of property.

B.  **The Property**

15.     MCI conveyed the Property to Melrose Club Management, Inc. n/k/a Daufuskie Club, Inc. ("DCI") on or about December 30, 1996, by special warranty deed.

16.     The details of the conveyance of the Property from MCI to DCI were set forth in

an unrecorded Transfer Agreement between the parties ("1996 Transfer Agreement" or the "Transfer Agreement").

17.     The purchase price for the Property was DCI's payoff of a $1,200,000.00 promissory note payable to Club Financial Corp.; assumption of MCI's liabilities, as defined in the Transfer Agreement; assumption of certain Additional Obligations, as defined in the Transfer Agreement; and the issuance of Club Memberships pursuant to the terms in the Transfer Agreement.

18.     Article 5 of the Transfer Agreement, entitled "Additional Obligations," provides as follows:

> 5.1    Purchaser's Additional Obligations.    As additional consideration for the transfer and sale of the Assets, Purchaser agrees to execute, on the Closing Date, the Assignment and Assumption Agreement whereby Purchaser agrees to assume and fund the costs of the Additional Obligations pursuant to the terms and conditions recited therein.  In the event Purchaser, at any time from the Closing Date to the expiration of twenty (20) years from the Closing Date, elects to not perform the Additional Obligations, or any material part thereof, then Purchaser shall provide written notice to Seller of its election (the "Written Notice"). Purchaser agrees to reconvey the Assets to Seller within thirty (30) days after the Written Notice has been received by Seller, if Seller, at its option in its sole discretion, notifies Purchaser, in writing within thirty (30) days after receipt of the Written Notice, that Seller agrees to accept such reconveyance. The closing of the reconveyance shall be in the same manner and the substantially same form of documentation as utilized for the Closing, and Seller shall assume all of the existing liabilities of Purchaser arising from its ownership and operation of the Assets, which liabilities shall not be greater than the Liabilities assumed by Purchaser at the Closing.  Purchaser agrees, for a period of seven (7) years from the Closing Date, that any mortgage or security agreement against the Assets shall only secure funding for capital improvements, replacements, renovations, repairs, or the operation of the Club. The parties agree that a memorandum setting forth the reconveyance and debt restrictions set forth in this Section shall be recorded against the Real Property and shall be a covenant running with the land and be binding on any successor or assign of Purchaser who acquires the Real Property.

("Article 5" or "Section 5.1").

19.    Exhibit A to the Second Amendment of the Transfer Agreement ("Exhibit A") defines "Additional Obligations" as including the following: (i) participation in and funding of a percentage of a beach renourishment project; (ii) funding of all operational deficits, as defined in Exhibit A, in connection with the operation of the Melrose Club facilities with no assessments to the Melrose Club members; (iii) renovation of the Beach Cottages; (iv) repairing and replacement of the golf course irrigation system, golf cart paths and sand traps; and (v) preparation of a business plan evaluation concerning the construction of a potential conference facility.

20.    Exhibit A defines "Operational Deficits" as "gross receipts, minus . . . operational expenses as set forth on Purchaser's financial statements prepared in accordance with generally accepted accounting principles."

21.    DCI thus granted MCI the right until 2016 to have the Property returned to MCI if DCI elected not to perform the Additional Obligations or any material part thereof. Article 5 states that the right is a covenant running with the land, binding on successors and assigns of DCI. DCI and MCI memorialized this right by executing a Memorandum of Agreement ("Memorandum"), which was recorded in the Beaufort County RMC Office on December 31, 1996, in Deed Book 911, at Page 1859.

22.    Paragraph 1 of the recorded Memorandum provides:

> This Memorandum is executed and filed of record to evidence the terms of Article 5 of that certain Transfer Agreement (the "Agreement") executed on September 27, 1996, as amended, between Seller and Purchaser. The specific terms and conditions in Section 5 of the Agreement (the "Restrictions") are covenants running with the land described on Schedule A hereto (the "Property"). After the date hereof, the Property shall be held, sold, and conveyed subject to the terms of the Restrictions, which shall run with the title to the Property and shall bind all parties having any right, title, or interest in the Property or any part thereof, their heirs,

successors, successors-in-title, and assigns and shall inure to the benefit of
Seller, unless released or terminated as provided.

Paragraph 2 of the recorded Memorandum sets forth the terms of the reconveyance right

as laid out in Article 5.

23.    The Transfer Agreement further provides:

14.1.6.  <u>Subsequent Assignments of the Assets</u>.  Notwithstanding
anything in this Agreement to the contrary,  Purchaser shall not, without
Seller's  express  prior  written  consent,  which  consent  will  not
unreasonably be withheld, transfer, or agree to transfer, in any manner, all
or substantially all of the Assets, except to (i) any person whose net worth
(determined in accordance with generally accepted accounting principles)
is not at least as great as that of Purchaser immediately after the transfer of
the Assets to Purchaser pursuant to this Agreement, and (ii) a person who
has experience and a quality reputation in the club and resort industries.
For all purposes of this Agreement, the term "person" shall be construed
as broadly as possible and shall include, without limitation, any natural
person,  corporation,  company,  limited  liability  company,  general
partnership,  limited  partnership,  limited  liability  partnership,
unincorporated association, joint venture, sole proprietorship, business
trust,  or  other  entity,  in  each  case  whether  or  not  for  profit.
Notwithstanding the above, Purchaser may sell portions of the Assets in
the ordinary course of business, provided that the sale of said Assets do
not  materially  impact  the  facilities  provided  to  the  Members  or  the
operation of the Club.

25.    Section  14.1.4  of  the  Transfer  Agreement  also  outlines  the  purchaser's

obligations:

<u>Purchaser Operations</u>.  Purchaser covenants to (i) operate the New Club
from  the  Real  Property  in  a  manner  materially  consistent  with  the
operation of the Club as it is currently operated, as modified by the New
Club Bylaws and including resort guests' play and usage of the facilities,
or pursuant to the operational standards of comparable golf and resort
facilities  operated  by  affiliates  of  Purchaser,  (ii)  maintain  in  good
condition the Assets, (iii) fund and pay all operational deficits generated
by Purchaser, (iv) not assess any Member any amount for operational or
capital expenditures, and (v) honor the Club Memberships granted to the
Members, which Club Memberships shall be binding on any subsequent
owner of the Real Property.

26.    With respect to a default by either party, the Transfer Agreement provides:

16.1.  <u>Event of Default</u>.  Except as otherwise expressly provided herein, either party hereto shall be deemed to be in default of this Agreement if such party fails or refuses to comply with the terms and conditions set forth herein for any reason other than the prior termination of this Agreement pursuant to a right to so terminate expressly set forth in this Agreement and said default continues for a period of thirty (30) days after written notice from the nondefaulting party to the defaulting party specifying the default . . . .

. . . .

17.2.  <u>Seller's Remedies After Closing</u>.  Except as otherwise provided in this Agreement, upon the occurrence of an Event of Default by Purchaser after Closing which is not cured within the time permitted, Seller shall be entitled to any remedy available at law or in equity, including specific performance, as determined by the arbitration proceedings in Article 18.

Section 18.1 provides that "[a]ny controversy arising out of, or relating to, this Agreement, or the breach thereof, shall be settled by binding arbitration" and outlines the terms for any arbitration proceeding between the parties.

27.    In 2002, DCI and Debtor entered into an agreement for the transfer of assets previously transferred by MCI to DCI pursuant to the Transfer Agreement.  On May 31, 2002, at the request of DCI, MCI executed an Estoppel Certificate, which provided that MCI consented to the transfer to Debtor and that Debtor assumed the obligations under the Transfer Agreement. The Estoppel Certificate provides in part:

General Narrative.  [MCI] has been advised of the pending transaction involving DCI and other related entities conveying certain assets to Purchaser.  [MCI] is a party to an agreement entitled "Transfer Agreement" originally dated September 17, 1996, as amended by the First Amendment and Second Amendment, (collectively the "Transfer Agreement") which was entered into by and between [MCI] and [DCI]. . . .  Included in the Transfer Agreement was specific obligations on the part of DCI which were defined as "Additional Obligations" in Section 5.1. Since the consummation of the Transfer Agreement, DCI has expended in excess of $45,000,000 for capital improvements, replacements, renovations, repairs and operation of the Club, a

8

portion of which expenditures has been borrowed and is evidenced by a promissory note and secured by a mortgage against certain real property, including the Real Property as defined in the Transfer Agreement.

Purchaser, an independent, arms-length buyer for value of certain assets of DCI, will be taking these assets subject to the Transfer Agreement. . . .

. . . .

Except for Paragraph 2 entitled <u>Operational Deficits</u> on Exhibit A to the Transfer Agreement, all other Additional Obligations, as defined in Section 5.1 and on Exhibit A to the Transfer Agreement, have been fully satisfied.

. . . .

[MCI] acknowledges that (i) certain of the assets being transferred by DCI to Purchaser as referenced hereinabove include the Assets as defined in the original Transfer Agreement, and (ii) the rights and corresponding obligations of DCI will be assigned to Purchaser by DCI as a part of this overall acquisition of assets and that effective with the closing, Purchaser will step into the shoes of DCI and assume the obligations under the Transfer Agreement. Based upon the information provided by DCI and Purchaser, [MCI] consents to the transfer of the assets and to the assignment.

. . . Reference is made to the Memorandum of Agreement which relates to the Transfer Agreement . . . . [MCI] acknowledges that as part of the acquisition of assets by Purchaser from DCI, Purchaser will be assuming a portion of the indebtedness referenced hereinabove in the General Narrative, which indebtedness exists and secures funding for capital improvements, replacements, renovations, repairs and operations of The Club . . . .

28.    By order entered October 30, 2009, this Court denied the motions to dismiss and joinders therein, filed by AFG, Beach First, Carolina Shores, CFT, the Dixons, Beach Cottages II, Beach Cottages III, and the Trustee.

9

## CONCLUSIONS OF LAW

### A. **Standard of Review**

Pursuant to Fed. R. Civ. P. 56(c), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7056, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial.  Listak v. Centennial Life Ins. Co., 977 F. Supp. 739, 743 (D.S.C. 1997) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).  Upon making this showing, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating that a genuine issue exists for trial.  Fed. R. Civ. P. 56(e); Campbell v. Capital One Bank (In re Broughton), C/A No. 99-06953-W, Adv. Pro. No. 00-80143-W, slip op. at 4-5 (Bankr. D.S.C. Mar. 20, 2001). "If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial."  Listak, 977 F. Supp. at 743 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986)).

### B. **Motions for Summary Judgment**

Carolina Shores' motion seeks summary judgment on the following grounds:

1.      The rights, title and interests of Carolina Shores are not subject to nor subordinate to MCI's rights as a matter of law; and

2.      The Debtor's alleged failure to perform does not constitute an "election" not to

perform as a matter of law.

The Trustee filed a response in support of Carolina Shores' motion, and MCI filed an objection.

AFG and Beach First filed a cross-motion for partial summary judgment on the following grounds:

1.      Any interest of MCI in the Property is subject to AFG and Beach First's mortgage interests in the Property; and

2.      Any reconveyance to MCI would be subject to MCI's assumption and payment of all liabilities, debts and accounts payable set forth on Debtor's financial statements as of the date the right to reconveyance accrued together with all debts, obligations, and accounts payable incurred by Debtor in the ordinary course of business of operating the assets through the date of closing and all contingent liabilities.

MCI filed an objection to AFG and Beach First's motion.

MCI seeks partial summary judgment on the following grounds:

1.      The right to reconveyance in Article 5 is a valid restrictive covenant running with title to the Property; and

2.      The asserted interests of the Defendants in the Property are subject and subordinate to the prior recorded reconveyance right; and

3.      The right to reconveyance has been triggered.

The Dixons, Beach Cottages II, Beach Cottages III, Ocean Front, and Easter Beach filed a joint objection, in which Pensco joined.  Additionally, Carolina Shores, CFT, AFG and Beach First, and the Trustee filed objections.

For the reasons described below, the Court grants partial summary judgment to Carolina Shores as to its second ground that Debtor's alleged failure to perform does not constitute an election not to perform as a matter of law.  The Court grants partial summary judgment to MCI as to its first ground that the reconveyance right described in Section 5.1 is a covenant running

with the title to the property.  With respect to the parties' remaining claims, the Court denies the motions for summary judgment.

**C.  <u>The Reconveyance Right Has Not Been Triggered</u>.**

The Court grants partial summary judgment to Carolina Shores on the issue that Debtor's alleged failure to fund all operational deficits does not constitute an election not to perform under Section 5.1 of the Transfer Agreement.  Accordingly, the Court denies summary judgment to MCI as to its related assertion that the reconveyance covenant has been triggered.

Initially, MCI challenges the Defendants' standing to interpret the terms of the Transfer Agreement because they are not signatories to the contract.  To demonstrate standing, a party must show an "injury-in-fact, causation, and redressability."  <u>In re Mut. Funds Inv. Litig.</u>, 529 F.3d 207, 216 (4th Cir. 2008).  MCI commenced this adversary case against the Defendants, claiming that their rights and interests in the Property are subject to and subordinate to MCI's rights under Article 5 and the Transfer Agreement.  The Court agrees with the Defendants' argument that any subordination of their interests through a construction of the Transfer Agreement would cause injury to them, which would be relieved by a favorable decision by this Court.  Thus, the Court rejects MCI's contention and finds the Defendants have standing in this matter.

Under South Carolina law, "[w]hen a contract is unambiguous, clear and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense."  <u>C.A.N. Enters., Inc. v. S.C. Health & Human Servs.</u>, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988).  "Common sense and good faith are the leading touchstones of construction of the provisions of a contract" and a construction that is "reasonable, fair and just . . . must prevail."  <u>Id.</u>  Furthermore, where "the language of a contract

is plain and capable of legal construction, that language alone determines the instrument's force and effect." <u>Ellis v. Taylor</u>, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994).

While the parties agree that Section 5.1 contains no ambiguity, they dispute what acts constitute a trigger of MCI's right to reconveyance. No evidence of a formal election by Debtor has been presented. However, in its motion, MCI asserts that the failure of Debtor and the Trustee to fund the operational deficits acts as a trigger of the reconveyance covenant. Further, MCI argues that the proposed sale in the bankruptcy case triggers its right to reconveyance. The Court disagrees with MCI's position and finds the language of Section 5.1 plainly sets forth the conditions necessary to trigger the reconveyance right.

The operative part of Section 5.1 provides:

> In the event Purchaser, at any time from the Closing Date to the expiration of twenty (20) years from the Closing Date, **elects** to not perform the Additional Obligations, or any material part thereof, then **Purchaser shall provide written notice to Seller of its election** (the "Written Notice"). Purchaser agrees to reconvey the Assets to Seller within thirty (30) days after the Written Notice has been received by Seller, if Seller, at its option in its sole discretion, notifies Purchaser, in writing within thirty (30) days after receipt of the Written Notice, that Seller agrees to accept such reconveyance.

(emphasis added). Because the terms are unambiguous, the Court will not look beyond this document, which clearly requires that two affirmative acts occur before MCI's reconveyance right is triggered. First, Debtor must elect not to perform the Additional Obligations, or any material part thereof. Secondly, Debtor must provide written notice to MCI of that election. Neither of those conditions has occurred.

The parties focus their dispute on the condition of election. The Court agrees with the parties opposing MCI's motion that the term "elect" is capable of being understood according to its plain and ordinary meaning, which requires a voluntary choice and a willing act on the part of

Debtor.  See William W. Bierce, Ltd. v. Hutchins, 205 U.S. 340, 346, 27 S. Ct. 524, 525 (1907) ("Election is simply what its name imports; a choice, shown by an overt act, between two inconsistent rights, either of which may be asserted at the will of the chooser alone.").  Section 5.1 does not provide for a party's insolvency or failure to perform, and the Court cannot rewrite the contract between the parties.  See C.A.N. Enters., Inc., 296 S.C. at 378, 373 S.E.2d at 587 (stating that courts are "without authority to alter a contract by construction or to make new contracts for the parties" but are "limited to the interpretation of the contract made by the parties themselves").

Furthermore, the use of such specific language appears reasonable.  As outlined by Exhibit A, the Additional Obligations, being assumed by the purchaser, included expensive beach renourishment, renovation of cottages, repairs and replacements to the golf course, and potential construction of a conference facility.  In the Estoppel Certificate, MCI acknowledged that DCI spent $45 million performing these parts of the obligations.  Since the Additional Obligations were extensive and the costs uncertain at the time the parties entered into the Transfer Agreement, it is logical that the purchaser may want an escape clause; that is, should the purchaser determine that it could not meet such significant expenses, it may wish to withdraw from its obligations by electing to not act further and return the assets to their original status rather than merely default and expose itself to a potentially more significant damage claim.

In addition, the Transfer Agreement provides MCI an alternative remedy for any failure of Debtor to fund operational deficits.  Section 14.1.4 also imposes a duty on Debtor to fund operational deficits, and Section 16.1 identifies a party as being in default if the party "fails or refuses to comply with the terms and conditions set forth herein . . . and said default continues for a period of thirty (30) days after written notice from the nondefaulting party."  (Emphasis

added). Sections 17.4 and 18.1 provide MCI with the right to "any remedy available at law or in equity, including specific performance" in an arbitration proceeding. Thus, MCI has a remedy to pursue outside of Section 5.1 for Debtor's alleged failure.[2]

Accordingly, finding that a voluntary, affirmative act is required, any failure of Debtor to perform does not and has not constituted an election so as to trigger MCI's right to reconveyance under Section 5.1.

Similarly, the proposed sale of Debtor's assets does not act as a trigger of MCI's reconveyance right. Section 5.1 is separate and distinct from Section 14.1.6, which specifically considers a sale of substantially all of the assets and sets out detailed requirements for a transfer. If the requirements are met, a transfer may occur without default or breach. Section 5.1 plainly does not address the sale of the property, but rather, is limited to an election not to perform the Additional Obligations.

Based on the foregoing analysis, the Court concludes that no election has been made under Section 5.1 and MCI's reconveyance right has not been triggered.

**D.** **The Reconveyance Right is a Covenant Running with the Land.**

The Court grants partial summary judgment to MCI as to MCI's first claim that the reconveyance right, as set forth in Section 5.1 of the Transfer Agreement and the recorded Memorandum, is a covenant running with the land.

Pursuant to South Carolina law, a covenant is a real covenant that runs with the land and binds successors to the original covenantor if three elements are found: (i) an indication the covenanting parties intended the covenant to run with the land; (ii) the covenant touches and concerns the real property; and (iii) the party required to observe the covenant has actual or

---

[2] The Court notes the Trustee's argument that even if MCI's right to reconveyance has been triggered, MCI is neither willing nor able to purchase Debtor's primary assets. In light of the Court's finding that no right has been triggered, it is not necessary to address this issue.

constructive notice of the covenant.  In re T 2 Green, LLC, 363 B.R. 753, 766 (Bankr. D.S.C. 2006); Harbison Cmty. Ass'n v. Mueller, 319 S.C. 99, 102-03, 459 S.E.2d 860, 862-63 (Ct. App. 1995).

In considering the first element, the Court must construe the covenant "so as to carry into effect the intention of the parties, which is to be collected from the whole instrument and from the circumstances surrounding its execution."  Cheves v. City Council of Charleston, 140 S.C. 423, 138 S.E. 867, 869 (1927); see also Midway Props., Inc. v. Pfister, 292 S.C. 104, 106, 354 S.E.2d 926, 927 (Ct. App. 1987) (reviewing the instrument as a whole to discern the parties' intent, and finding the general rule of strict construction of restrictions is "not applicable if it will defeat the plain and obvious purpose of the restrictions").  The Court may look to the language of the covenant to determine whether the language used evidences an intention to attach the attribute of assignability.  Cheves, 140 S.C. 423, 138 S.E. at 869; see also Gressette v. S.C. Elec. & Gas Co., 370 S.C. 377, 382-83, 635 S.E.2d 538, 541 (2006) (construing the language of an easement).  The use of language indicating a covenant shall bind the "heirs and assigns" of a property owner is evidence of such intent.  Id.

The Court finds the plain language of the Memorandum and Section 5.1 evidences a clear intention that the reconveyance right would run with the land.  The final sentence of Section 5.1 states that the Memorandum setting forth the reconveyance shall be binding on any successor or assign of the purchaser who acquires the Property.  The Memorandum, which was recorded to memorialize the agreement contained in Section 5.1, provides that "the Property shall be held, sold, and conveyed subject to the terms of the Restrictions, which shall run with the title to the Property and shall bind all parties having any right, title, or interest in the Property or any part thereof, their heirs, successors, successors-in-title, and assigns."

16

Additionally, the Estoppel Certificate provided that Debtor acquired the Property subject to the Transfer Agreement, and that upon the transfer, Debtor would "step into the shoes of DCI and assume the obligations under the Transfer Agreement." The Estoppel Certificate also made reference to the Memorandum. Thus, the Court concludes the contracting parties to the Transfer Agreement intended for the reconveyance covenant to run with the title to the land.

In determining whether the second element is satisfied, Epting v. Lexington Water Power Co., 177 S.C. 308, 181 S.E. 66 (1935), is instructive. The Epting Court distinguished personal covenants and covenants running with the land, stating "a covenant is personal when it has no relation to the land conveyed . . . or is not connected with the title." 177 S.C. 308, 181 S.E. at 71. In contrast, to run with the land, a covenant "must relate to the realty demised, having for its object something annexed to, or inherent in, or connected with the land; that its performance or nonperformance must affect the nature, quality, value, or mode of enjoyment of the demised premises." Id. The South Carolina Court of Appeals has held that "covenants that require grantees to pay assessments for the upkeep of a particular parcel of property are . . . real covenants which 'touch and concern' land, and therefore, run with the land." Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp., 368 S.C. 342, 361, 628 S.E.2d 902, 913 (Ct. App. 2006).

The Defendants contest this element, arguing that the performance or nonperformance of the covenant would not affect the nature, quality or value of the Property, but would rather just result in a change of ownership. However, under Section 5.1, Debtor has an obligation to assume and fund the costs of the Additional Obligations, which includes funding of Operational Deficits. Pursuant to the Transfer Agreement, Operational Deficits are defined as gross receipts minus operational expenses, which include, under generally accepted accounting principles, such

things as taxes, insurance, repairs and maintenance.  Here, the reconveyance covenant touches and concerns the Property by requiring the covenantor to perform obligations which involve the maintenance and repair of the Property that relate to the "nature, quality, value, or mode of enjoyment of the demised premises."  Furthermore, Section 5.1 provides MCI with a right to regain title or ownership of the Property under certain circumstances at a structured price.

The third element, notice, is not disputed.  Debtor had constructive notice of the reconveyance covenant by way of the Memorandum, which was recorded in the chain of title.  Furthermore, the Estoppel Certificate establishes that Debtor had actual notice of the Transfer Agreement and Memorandum and of its assumption of the obligations under the Transfer Agreement.

Thus, the Court concludes the reconveyance right is a covenant that runs with the title to the Property, and grants partial summary judgment to MCI as to this issue.

**E.  Priority of Interests**

In its motion, MCI seeks summary judgment as to its claim that the Defendants' interests in the Property are subject and subordinate to its reconveyance right.[3]  Carolina Shores seeks summary judgment with respect to its claim that its interest is not subject to MCI's rights.  AFG and Beach First moved for summary judgment on their claims that MCI's interest is subject to AFG and Beach First's interests, and that upon a reconveyance, MCI would take the property subject to all liabilities set forth on Debtor's financial statements and all obligations incurred by Debtor in the ordinary course of business of operating the assets.  In support of their motions, Carolina Shores, AFG, and Beach First assert their debts are existing liabilities of Debtor which are not greater than the liabilities assumed by DCI, and therefore, under the terms of the Transfer Agreement, MCI would assume these debts upon a reconveyance.

---

[3] The reconveyance right is only operative if triggered.

In the motions presently before the Court, MCI's rights depend upon the triggering of the reconveyance right, and the arguments of Carolina Shores, and AFG and Beach First primarily depend upon a hypothetical reconveyance of the Property to MCI.  However, for the reasons stated above, the Court has found that MCI's right of reconveyance under Section 5.1 has not been triggered by any alleged failure of Debtor to fund the Additional Obligations, nor is it triggered by the pending sale of the assets of the bankruptcy estate. Therefore, with respect to the priority of interests between MCI and the Defendants, the Court finds that summary judgment should be denied at this time on MCI's second claim, Carolina Shores' first claim, and AFG and Beach First's first and second claims.

As an additional ground, CFT objected to MCI's motion, claiming that a genuine issue of fact exists as to whether the sale of Salty Fare materially impacted the facilities or operation of the Club.  The Court agrees and finds a brief analysis of that issue would be helpful to these and similarly situated parties.[4]

In April 2007, Debtor transferred the portion of property known as Salty Fare, consisting of the embarkation center with docks and parking, to CFT.  As set forth above, Section 14.1.6 of the Transfer Agreement provides terms and conditions for assignments of the assets and allows for transfers of portions of the assets in the ordinary course of business, absent MCI's consent, provided that the sale of the assets does not materially impact the facilities or the operation of the Club.

CFT contends the sale of Salty Fare did not materially impact the facilities or operation of the Club, or at least, there exists a genuine issue of fact in this regard.  CFT asserts that MCI failed to object to the Trustee's motion to reject the commercial lease agreement, which the

---

[4] These same issues may also apply to Beach Cottages, Beach Cottages II, and Beach Cottages III, and to the mortgages given on the portions of property owned by these parties.

Court authorized.  The Court agrees that the Trustee's decision to surrender the asset offers some evidence in favor of CFT's position that the sale of Salty Fare was not of material impact and that the property was validly transferred in the ordinary course of business under Section 14.1.6. However, MCI points to conflicting evidence presented by Bill Dixon's deposition, in which he stated that Salty Fare was a "crucial" piece of property.  When considering a motion for summary judgment, the Court does not weigh the evidence, but determines if a genuine issue of fact remains.  Because the conflicting evidence indicates that there is a genuine issue of fact for this claim, MCI's motion for summary judgment as to its asserted superiority over CFT's interest must be denied for this additional reason.

### Conclusion

Based on the foregoing reasons, the Court grants partial summary judgment to Carolina Shores and finds that Debtor's alleged failure to perform by funding operational deficits does not constitute an election so as to trigger MCI's right to reconveyance under Section 5.1 of the Transfer Agreement.  The Court grants partial summary judgment to MCI and concludes that the reconveyance right of Section 5.1 is a covenant running with the title to the Property.  The Court denies the motions for summary judgment as to the parties' remaining claims at this time.

**AND IT IS SO ORDERED.**

Columbia, South Carolina
December 21, 2009