Document    Page 1 of 19

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>DAUFUSKIE ISLAND PROPERTIES, LLC,<br><br>                                              Debtor. | C/A No. 09-00389-JW<br><br>Adv. Pro. No. 09-80094-JW |
| The Melrose Club, Inc.,<br><br>                                              Plaintiff,<br><br>v.<br><br>Robert C. Onorato, in his capacity as Chapter 11 Trustee for the Estate of Daufuskie Island Properties, LLC; Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989; William R. Dixon, Jr. and Gayle Bulls Dixon; AFG, LLC; Carolina Shores, LLC; Beach First National Bancshares, Inc. d/b/a Beach First National Bank; Beach Cottages II, LLC; Pensco Trust Company, Inc.; The Beach Cottages, LLC; The Greenery, Inc.; Coastal Connections, Inc.; Beach Cottages III, LLC; Easter Beach Villas, LLC; and Ocean Front Villas, LLC,<br><br>                                              Defendants. | Chapter 11<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MCI'S MOTION FOR SUMMARY JUDGMENT** |
| The Melrose Club, Inc.,<br><br>                                              Plaintiff,<br><br>v.<br><br>DAUFUSKIE ISLAND PROPERTIES, LLC; William R. Dixon, Jr.; Gayle Bulls Dixon; Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989,<br><br>                                              Defendants,<br><br>of whom Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989, is<br><br>                               Third Party Plaintiff,<br><br>v.<br><br>William R. Dixon, Jr.,<br><br>                                 Third Party Defendant. | |

This matter comes before the Court on the motion for summary judgment ("Motion") filed by The Melrose Club, Inc. ("MCI") as to the counterclaims for: (1) intentional interference with a contractual relationship; (2) civil conspiracy;[1] (3) abuse of process;[2] and (4) slander of title.[3] Responses to the Motion were filed by the Dixons, Beach II, Beach III, and Pensco (collectively, the "Counterclaimants"). This Court has jurisdiction over the proceeding pursuant to 28 U.S.C. §§ 1334 and 157. Pursuant to Rule 52, Fed. R. Civ. P., made applicable to this proceeding by Rule 7052, Fed. R. Bankr. P., the Court makes the following Findings of Fact and Conclusions of Law.[4]

## FINDINGS OF FACT

**A. The Relevant Parties and Property**

1. MCI, a South Carolina nonprofit mutual benefit corporation, previously owned approximately 300 acres on Daufuskie Island, which is located in Beaufort County, South Carolina (the "Property"). Improvements on the Property included, <u>inter</u> <u>alia</u>, the 52-room Melrose Inn, 37 Beach Cottages, Beach Club, golf and tennis club house, health and fitness center, equestrian center, Sportsman's Lodge, administration and maintenance facility, together with interests in the embarkation center at Salty Fare on Hilton Head Island with docks and parking, and debarkation center at Melrose Landing on Daufuskie Island.

---

[1] The counterclaims for intentional interference with a contractual relationship and civil conspiracy were alleged by William R. Dixon, Jr. and Gayle Bulls Dixon (collectively, the "Dixons"), Beach Cottages II, LLC ("Beach II"), Beach Cottages III, LLC ("Beach III"), Easter Beach Villas, LLC ("Easter Beach"), and Ocean Front Villas, LLC ("Ocean Front").

[2] The counterclaim for abuse of process was alleged by the Dixons, Beach II, Beach III, Easter Beach, Ocean Front, and Pensco Trust Company, Inc. ("Pensco").

[3] The counterclaim for slander of title was alleged by Beach II, Beach III, Easter Beach, Ocean Front, and Pensco. At the hearing on the Motion, counsel for the parties indicated they did not intend to pursue this counterclaim.

[4] To the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent that any Conclusions of Law constitute Findings of Fact, they are so adopted.

2

2. MCI conveyed the Property to Melrose Club Management, Inc. n/k/a Daufuskie Club, Inc. ("DCI") on or about December 30, 1996, by special warranty deed. The details of the conveyance of the Property from MCI to DCI were set forth in an unrecorded Transfer Agreement between the parties ("Transfer Agreement") and recorded Memorandum of Agreement ("Memorandum"), which have been the subject of extensive litigation in this adversary and the bankruptcy case.

3. Article 5 of the Transfer Agreement, entitled "Additional Obligations," provides as follows:

> 5.1 <u>Purchaser's Additional Obligations</u>. As additional consideration for the transfer and sale of the Assets, Purchaser agrees to execute, on the Closing Date, the Assignment and Assumption Agreement whereby Purchaser agrees to assume and fund the costs of the Additional Obligations pursuant to the terms and conditions recited therein. In the event Purchaser, at any time from the Closing Date to the expiration of twenty (20) years from the Closing Date, elects to not perform the Additional Obligations, or any material part thereof, then Purchaser shall provide written notice to Seller of its election (the "Written Notice"). Purchaser agrees to reconvey the Assets to Seller within thirty (30) days after the Written Notice has been received by Seller, if Seller, at its option in its sole discretion, notifies Purchaser, in writing within thirty (30) days after receipt of the Written Notice, that Seller agrees to accept such reconveyance. The closing of the reconveyance shall be in the same manner and the substantially same form of documentation as utilized for the Closing, and Seller shall assume all of the existing liabilities of Purchaser arising from its ownership and operation of the Assets, which liabilities shall not be greater than the Liabilities assumed by Purchaser at the Closing. Purchaser agrees, for a period of seven (7) years from the Closing Date, that any mortgage or security agreement against the Assets shall only secure funding for capital improvements, replacements, renovations, repairs, or the operation of the Club. The parties agree that a memorandum setting forth the reconveyance and debt restrictions set forth in this Section shall be recorded against the Real Property and shall be a covenant running with the land and be binding on any successor or assign of Purchaser who acquires the Real Property.

("Article 5" or "Section 5.1").

4. Exhibit A to the Second Amendment of the Transfer Agreement ("Exhibit A")

3

defines "Additional Obligations" as including the following: (i) participation in and funding of a percentage of a beach renourishment project; (ii) funding of all operational deficits, as defined in Exhibit A, in connection with the operation of the Melrose Club facilities with no assessments to the Melrose Club members; (iii) renovation of the Beach Cottages; (iv) repairing and replacement of the golf course irrigation system, golf cart paths and sand traps; and (v) preparation of a business plan evaluation concerning the construction of a potential conference facility.

5.  Exhibit A defines "Operational Deficits" as "gross receipts, minus . . . operational expenses as set forth on Purchaser's financial statements prepared in accordance with generally accepted accounting principles."

6.  Paragraph 1 of the recorded Memorandum provides:

> This Memorandum is executed and filed of record to evidence the terms of Article 5 of that certain Transfer Agreement (the "Agreement") executed on September 27, 1996, as amended, between Seller and Purchaser. The specific terms and conditions in Section 5 of the Agreement (the "Restrictions") are covenants running with the land described on Schedule A hereto (the "Property"). After the date hereof, the Property shall be held, sold, and conveyed subject to the terms of the Restrictions, which shall run with the title to the Property and shall bind all parties having any right, title, or interest in the Property or any part thereof, their heirs, successors, successors-in-title, and assigns and shall inure to the benefit of Seller, unless released or terminated as provided.

Paragraph 2 of the recorded Memorandum sets forth the terms of the reconveyance right as laid out in Article 5.

7.  Section 14.1.4 of the Transfer Agreement also outlines the purchaser's obligations:

> Purchaser Operations. Purchaser covenants to (i) operate the New Club from the Real Property in a manner materially consistent with the operation of the Club as it is currently operated, as modified by the New Club Bylaws and including resort guests' play and usage of the facilities,

or pursuant to the operational standards of comparable golf and resort facilities operated by affiliates of Purchaser, (ii) maintain in good condition the Assets, (iii) fund and pay all operational deficits generated by Purchaser, (iv) not assess any Member any amount for operational or capital expenditures, and (v) honor the Club Memberships granted to the Members, which Club Memberships shall be binding on any subsequent owner of the Real Property.

8. Section 14.1.6 of the Transfer Agreement provides:

Subsequent Assignments of the Assets. Notwithstanding anything in this Agreement to the contrary, Purchaser shall not, without Seller's express prior written consent, which consent will not unreasonably be withheld, transfer, or agree to transfer, in any manner, all or substantially all of the Assets, except to (i) any person whose net worth (determined in accordance with generally accepted accounting principles) is not at least as great as that of Purchaser immediately after the transfer of the Assets to Purchaser pursuant to this Agreement, and (ii) a person who has experience and a quality reputation in the club and resort industries. For all purposes of this Agreement, the term "person" shall be construed as broadly as possible and shall include, without limitation, any natural person, corporation, company, limited liability company, general partnership, limited partnership, limited liability partnership, unincorporated association, joint venture, sole proprietorship, business trust, or other entity, in each case whether or not for profit. Notwithstanding the above, Purchaser may sell portions of the Assets in the ordinary course of business, provided that the sale of said Assets do not materially impact the facilities provided to the Members or the operation of the Club.

9. With respect to a default by either party, the Transfer Agreement provides:

16.1. Event of Default. Except as otherwise expressly provided herein, either party hereto shall be deemed to be in default of this Agreement if such party fails or refuses to comply with the terms and conditions set forth herein for any reason other than the prior termination of this Agreement pursuant to a right to so terminate expressly set forth in this Agreement and said default continues for a period of thirty (30) days after written notice from the nondefaulting party to the defaulting party specifying the default . . . .

. . . .

17.2. Seller's Remedies After Closing. Except as otherwise provided in this Agreement, upon the occurrence of an Event of Default by Purchaser after Closing which is not cured within the time permitted,

5

> Seller shall be entitled to any remedy available at law or in equity, including specific performance, as determined by the arbitration proceedings in Article 18.

Section 18.1 provides that "[a]ny controversy arising out of, or relating to, this Agreement, or the breach thereof, shall be settled by binding arbitration" and outlines the terms for any arbitration proceeding between the parties.

10. In 2002, DCI and Debtor entered into an agreement for the transfer of the assets previously transferred by MCI to DCI pursuant to the Transfer Agreement. On May 31, 2002, at the request of DCI, MCI executed an Estoppel Certificate, which provided that MCI consented to the transfer to Debtor and that Debtor assumed the obligations under the Transfer Agreement.

11. Debtor, the current owner of the Property except as indicated below, is a limited liability company with the Dixons serving as its two members. On January 20, 2009, Debtor filed a petition seeking relief under Chapter 11 of the Bankruptcy Code. On March 17, 2009, the Court ordered the appointment of a Trustee in Debtor's bankruptcy case.

12. William Dixon, Jr. ("Bill Dixon") has also filed a proof of claim in the amount of $34,692,660.58 based on a mortgage and lien on portions of the Property owned by Debtor. The Trustee and Carolina Shores both dispute this claim in separate adversary proceedings, Adversary Proceeding No. 09-80120-jw and 09-80134-jw, respectively.

13. Beach II is the record owner of a portion of the Property transferred from DCI to Debtor.[5] Beach II has filed a claim for $43,067.51 in the bankruptcy case based on rental management revenue and an unauthorized loan made to Debtor in June 2008.

14. Beach III is the record owner of a portion of the Property transferred from DCI to

---

[5] Debtor transferred certain lots to The Beach Cottages, LLC in 2003, who subsequently conveyed the lots to Beach II in 2005. Debtor also directly conveyed certain lots to Beach II in 2006.

Debtor.[6]  Beach III has filed a claim for $781,935.31 in the bankruptcy case based on rental management revenue and a series of promissory notes secured by the portion of Property owned by Beach II.

15.   Pensco was joined in this adversary as the holder of mortgages on the property owned by Beach III.  Pensco characterizes itself as a passive custodian on behalf of third-party individuals who hold the promissory notes.

16.   Easter Beach holds a mortgage on the property owned by Beach II.

17.   Ocean Front holds a mortgage on the property owned by Beach III.

**B. Litigation**

18.   Before Debtor filed its bankruptcy petition, MCI commenced a state court action, The Melrose Club, Inc. v. Daufuskie Island Properties, LLC, C/A No. 2008-CP-07-3647, in the Court of Common Pleas of South Carolina for Beaufort County (the "State Court Action") on September 25, 2008, against Debtor, the Dixons, DCI, and Stewart Kittredge Collins and/or Susan and Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989 ("Collins Family Trust").  Robert C. Onorato, the Chapter 11 Trustee ("Trustee") for the Debtor filed a Notice of Removal on June 17, 2009, which commenced Adversary Proceeding No. 09-80095.

19.   In connection with the State Court Action, MCI filed a Notice of Lis Pendens against the Property.  The Counterclaimants allege that the pre-petition filing of the State Court Action and lis pendens halted any pending sales of the Property and led to Debtor's insolvency.

20.   MCI commenced Adversary Proceeding No. 09-80094[7] on June 15, 2009, and amended its complaint on August 21, 2009, alleging that (1) Debtor failed to perform the

---

[6] Beach III acquired title to the portion of the Property from Debtor in 2006.

[7] The court entered an Order on October 9, 2009, consolidating the two adversary proceedings.

7

additional obligations as provided for in the Transfer Agreement; (2) the failure to fund constitutes an election not to perform the additional obligations under Article 5 of the Transfer Agreement; (3) MCI has the right to repurchase the Property subject to the terms of Article 5 and Memorandum; and (4) the defendants' rights, title, and interests in the Property still owned by Debtor or previously transferred by Debtor are subordinate to MCI's rights under Article 5 and the Memorandum.

21.    On December 21, 2009, the Court entered an Order (the "December 21 Order") on various motions for summary judgment, and the responses and objections thereto, submitted by the parties, finding that MCI's reconveyance right set forth in Section 5.1 of the Transfer Agreement and the recorded Memorandum is a covenant running with the land.  The Court further found that Debtor's alleged failure to fund operational deficits and the proposed sale of Debtor's assets does not constitute an election not to perform under Section 5.1, and thus, the reconveyance covenant in favor of MCI had not been triggered at that time.[8]

22.    On January 7, 2010, the Court entered an Order in the bankruptcy case authorizing the proposed sale of substantially all the estate's assets for $49.5 million pursuant to § 363(b)(1) and (f) to Montauk Resorts, LLC ("Montauk") free and clear of liens, claims, encumbrances, and other interests, including the reconveyance covenant, and approving the assumption and assignment of certain unexpired executory contracts and leases ("Sale Order").[9] Subsequently, in connection with the proposed sale to Montauk, the Court entered an Order Approving Settlement Between the Estate and MCI for $1 million.  To date, the proposed sale has not closed, which is attributable to Montauk's failure to obtain financing based on the present

---

[8] By Order entered April 2, 2010, the Court denied MCI's motion to alter or amend the December 21 Order.

[9] The Court denied MCI's motion to vacate, or in the alternative, to alter or amend the Sale Order by order entered May 3, 2010.

8

circumstances of this case.

23. On May 7, 2010, upon the Trustee's motion and due to his inability to obtain funds to protect the Property, the Court entered an Order in the bankruptcy case authorizing the sale of substantially all of the estate's assets at auction free and clear of liens, claims, encumbrances and other interests, including the reconveyance covenant, and approving the assumption and assignment of certain unexpired executory contracts and leases ("Auction Order").

## CONCLUSIONS OF LAW

### A. Standard of Review

Pursuant to Rule 56(c), Fed. R. Civ. P., made applicable to this adversary proceeding by Rule 7056, Fed. R. Bankr. P., summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial. Listak v. Centennial Life Ins. Co., 977 F. Supp. 739, 743 (D.S.C. 1997) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986)). Summary judgment is not appropriate "[e]ven if there is no dispute as to the evidentiary facts," but the "ultimate factual conclusions to be drawn from them are in dispute." Lamb v. Qualex, Inc., 33 F. App'x 49, 53 (4th Cir. 2002).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). Upon making this showing, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating that a genuine

9

issue exists for trial. Fed. R. Civ. P. 56(e); Campbell v. Capital One Bank (In re Broughton), C/A No. 99-06953-W, Adv. Pro. No. 00-80143-W, slip op. at 4-5 (Bankr. D.S.C. Mar. 20, 2001). "If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial." Listak, 977 F. Supp. at 743 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986)). In considering a motion for summary judgment, "[a]ll evidence must be viewed in the light most favorable to the nonmoving party." Listak, 977 F. Supp. at 743 (citing Perini Corp. v. Perini Constr., Inc., 915 F. 2d 121, 123 (4th Cir. 1990)).

### B. Analysis of the Counterclaims

In their amended answers, the Counterclaimants alleged, among other things, the counterclaims of intentional interference with contract, civil conspiracy, abuse of process, and slander of title. MCI moves for summary judgment as to each of these counterclaims.

#### a. Intentional Interference with Contract

Pursuant to South Carolina law, there are five elements that must be alleged and proven for a claimant to prevail in an action for intentional interference with a contractual relationship: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of its breach; (4) absence of justification; and (5) resulting damages. Eldeco, Inc. v. Charleston County Sch. Dist., 372 S.C. 470, 480, 642 S.E.2d 726, 731 (2007).

In alleging this counterclaim, the Dixons, Beach II, Beach III, Easter Beach, and Ocean Front stated that they advanced money to Debtor that was secured by notes, security agreements and/or mortgages, and MCI knew of the contractual obligations owed to these five parties. The Counterclaimants claim that MCI intentionally and unjustifiably interfered with Debtor's

10

property sales to third-party buyers[10] by making threatening telephone calls to the prospective buyers in an attempt to stop the sales. The Counterclaimants assert that these sales would have provided the necessary funds to pay for Debtor's ongoing operational costs and its various obligations to creditors, including these parties, and MCI's intentional interference with Debtor's contractual obligations to the Counterclaimants resulted in damages.

MCI argues that the Counterclaimants' action must fail for lack of standing because they were not parties to Debtors' contracts for the sales of the Property. MCI also asserts the Counterclaimants have not alleged facts to show MCI acted with the intent to procure Debtor's breach of its contracts, or that MCI had knowledge of Debtor's contractual obligations to the Counterclaimants. Additionally, MCI argues that any alleged interference was justified by its good faith pursuit of its legal right in connection with transfers that would materially impact the facilities or operation of the Club.

After considering the parties' arguments made in their pleadings and at the hearing and reviewing the deposition testimony and other exhibits cited by the parties, the Court finds that the elements of the cause of action have not been met and summary judgment in favor of MCI is appropriate. In asserting the counterclaim and responding to MCI's Motion, the Counterclaimants rely on factual allegations and testimony regarding both the potential property sales from Debtor to third parties and Debtor's contractual obligations to the Counterclaimants collectively to satisfy the requisite elements of the claim. However, it appears that the Counterclaimants have failed to set forth sufficient facts to satisfy the elements with respect to Debtor's contractual obligations to the Counterclaimants or the proposed sales to the third-party purchasers.

---

[10] The deposition testimony and exhibits show that Debtor had executed a contract in July 2008 for the sale of the Melrose Inn to Melrose Resort Development Group, LLC, and had received a letter of intent dated August 2008 for the purchase of the Melrose Landing Property from Vinings Marine Group, LLC.

11

In regard to the contracts between Debtor and the Counterclaimants, the Counterclaimants have not alleged any facts to support the element that MCI intentionally procured the breach of those contractual obligations. Rather, Counterclaimants point only to deposition testimony stating that unidentified MCI members made phone calls to the prospective purchasers of the Melrose Inn and Melrose Landing in an attempt to disrupt the sales to those third parties. Even accepting this factual allegation as true, it does not demonstrate that MCI members engaged in this conduct to intentionally cause Debtor to breach its financial obligations to the Counterclaimants.

In analyzing the potential sales of portions of the Property to third parties, the Court notes that the Counterclaimants were not parties to any sales contract between Debtor and third parties, and the parties have acknowledged that South Carolina case law has yet to determine if a claim for interference with contractual relations should be extended to third party beneficiaries. Even assuming that South Carolina courts might be inclined to provide third party beneficiaries with a right to recovery for such a claim, the Counterclaimants have not shown that they were, in fact, the intended beneficiaries of the proposed sales of the property.[11] Consequently, the Counterclaimants have not adequately demonstrated that any alleged interference by MCI with Debtor's property sales to third parties directly resulted in damages to them.

Accordingly, the Court grants summary judgment to MCI as to the intentional interference with contracts counterclaim.

---

[11] The Counterclaimants cite the following cases from other jurisdictions to support their contention that they have standing to assert a cause of action for intentional interference with a contract between Debtor and the potential purchasers of the property: Tamposi Assocs, v. Star Market Co., 406 A.2d 132 (N.H. 1979); Reynolds v. Owen, 380 A.2d 543 (Conn. Super. Ct. 1977); and Bitzke v. Folger, 286 N.W. 36 (Wis. 1939). However, these cases extend such a claim only to parties who are established to be third party beneficiaries. The Tamposi court found a third party may bring such a claim only when the contract provides that performance of the contract will satisfy some obligation to the third party, or the contract is "so expressed as to give the promisor reason to know that a benefit to a third party is contemplated;" an incidental beneficiary is not entitled to recovery where "the interference rendered one party to the contract insolvent and unable to satisfy its separate and distinct contractual obligations." 406 A.2d at 134-35.

### b. Civil Conspiracy

To prevail on a claim for civil conspiracy, a party must prove the following elements: (1) the combination of two or more people; (2) for the purpose of injuring the plaintiff; (3) which causes special damages. Pye v. Estate of Fox, 369 S.C. 555, 566-67, 633 S.E.2d 505, 511 (2006). "Conspiracy may be inferred from the very nature of the acts done, the relationship of the parties, the interests of the alleged conspirators, and other circumstances." Id. at 567, 633 S.E.2d at 511 (internal citation omitted). The claimant need not prove the existence of an unlawful act. Lee v. Chesterfield Gen. Hosp., Inc., 289 S.C. 6, 11, 344 S.E.2d 379, 382 (Ct. App. 1986). A corporation cannot conspire with itself, and thus, agents for a corporation who act in the scope of their duties cannot conspire with the corporation. McMillan v. Oconee Mem'l Hosp., Inc., 367 S.C. 559, 564-65, 626 S.E.2d 884, 887 (2006). However, "the agents of a corporation are legally capable, as individuals, of conspiracy among themselves or with third parties." Lee, 289 S.C. at 13-14, 344 S.E.2d at 383.

The Dixons, Beach II, Beach III, Easter Beach, and Ocean Front assert that MCI conspired with its agents, board members, and members to harm Debtor and its creditors and stakeholders, including the Counterclaimants, by filing the State Court Action and lis pendens and forcing Debtor into financial ruin. Based on the deposition testimony discussed in more detail below, the Counterclaimants argue these parties wrongfully placed new members onto MCI's board, commenced litigation without authorization, and funded the litigation with the objective to repurchase the Property using MCI's rights.

MCI argues that summary judgment is appropriate because there is no genuine dispute that MCI's agents, board members, and members were acting on behalf of MCI, and pursuant to undisputed South Carolina law, a corporation cannot conspire with itself. Further, MCI contends

13

that its purpose has been to protect its rights in the covenant on the property.

The Court finds that the Counterclaimants have sufficiently demonstrated that genuine issues of fact exist and denies summary judgment as to this counterclaim. The Court agrees with the Counterclaimants that there is evidence to show the involvement of two or more people for the purpose of causing injury to the Debtor and its creditors. The deposition testimony of MCI board members Kathy Hall and Richard Silver provide support for the Counterclaimants' allegations that the Melrose Property Owners' Association ("MPOA") and the Bloody Point Property Owners Association ("BPPOA"), entities whose members and interests overlap with those of MCI but who are separate and distinct from MCI, funded approximately $450,000 for the legal action, and are further involved in the litigation via the appointment of Silver, Mitch Evans, and Tony Simonelli as board members in 2008.[12]

The deposition testimony of Hall and Silver, along with Wilson MacEwen, another MCI board member, also supports the Counterclaimants' assertion that Silver, Evans, and Simonelli were appointed to the board without adherence to MCI's Bylaws, MCI had not conducted annual meetings or board elections in accordance with the Bylaws for approximately ten years, and the identity and number of MCI members is uncertain. The MCI board members' deposition testimony also offers supporting evidence of the Counterclaimants' assertions that MCI was aware of Debtor's pending sales to third parties, including that of the Melrose Inn, and that while MCI observed what they considered to be deterioration of the property due to lack of maintenance and repairs, the MCI board did not review or request Debtor's financial statements from 2007 and 2008 to determine if an operational deficit existed prior to filing the lawsuit. Further, although the board members testified their desired remedy was reconveyance of the

---

[12] Silver and Hall's deposition testimony establishes that Simonelli is president of the BPPOA, Silver is treasurer of BPPOA, and Evans is the president of the MPOA.

14

Property, Kathy Hall was unsure why the lawsuit itself did not seek reconveyance.

While the Court does not consider whether the evidence proves the Counterclaimants' allegation that parties other than MCI conspired with MCI to use MCI's rights at the expense of Debtor and its creditors by filing the lawsuit and lis pendens, blocking any pending sale of Debtor's property and leading to Debtor's financial demise, the Counterclaimants' factual assertions and supporting evidence indicate to the Court that such a conclusion could be drawn. Furthermore, while the Counterclaimants acknowledge that its asserted causes of action allege the same sum of damages, which is insufficient to satisfy the element of special damages for civil conspiracy, the Court agrees with the Counterclaimants that they may plead the claim alternatively to abuse of process. As a result, the Court must deny MCI's Motion on the counterclaim of civil conspiracy.

### c. Abuse of Process

South Carolina law provides the elements of an abuse of process cause of action are: (1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding. Huggins v. Winn-Dixie Greenville, Inc., 249 S.C. 206, 209, 153 S.E.2d 693, 694 (1967); Whitfield Constr. Co. v. Bank of Tokyo Trust Co., 338 S.C. 207, 223, 525 S.E.2d 888, 897 (Ct. App. 1999). The purpose "need not be illegitimate; rather, the abuse occurs when the purpose is accomplished by using the process in a manner in which it was not intended to be used." Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, 351 S.C. 65, 70, 567 S.E.2d 251, 253 (Ct. App. 2002). A "definite act or threat not authorized by the process or aimed at an object not legitimate" is required. Hainer v. Am. Med. Int'l, Inc., 328 S.C. 128, 136, 492 S.E.2d 103, 107 (1997).

"'[P]rocess,' as it pertains to the abuse of process tort, embraces the full range of

15

activities and procedures attendant to litigation." Food Lion, 351 S.C. at 70, 567 S.E.2d at 253. The South Carolina Supreme Court has found that the filing of a lis pendens and complaint for specific performance constituted abuse of process where the defendant had the "ulterior purpose of preventing a sale to third parties in hopes of obtaining financial backing with which to purchase the property at an advantageous price." Broadmoor Apartments v. Horwitz, 306 S.C. 482, 487, 413 S.E.2d 9, 12 (1991).

      To support its counterclaim of abuse of process, the Counterclaimants state that MCI initiated the State Court Action, lis pendens, and this adversary proceeding with the ulterior motive of circumventing the contractual requirements of the Transfer Agreement, seeking additional rights or monies to which it is not entitled under the Transfer Agreement, and having the Counterclaimants' liens subordinated to those of MCI. The Counterclaimants assert that the deposition testimony of Kathy Hall and Gayle Dixon shows that MCI filed the lawsuit due to the purported deterioration of services, and pursuant to the Transfer Agreement, MCI's remedies for any alleged insufficient provision of services is limited by the arbitration clause of Section 18.1. Furthermore, the Counterclaimants point to the same deposition testimony relied upon for their civil conspiracy counterclaim and contend that MCI was aware of the pending sale of the Melrose Inn and letter of intent for the sale of Melrose Landing and filed the State Court Action and lis pendens to block the sales and ongoing development of the Property.

      The Counterclaimants also point to the deposition testimony previously noted which indicates that three new MCI Board members were hastily appointed prior to the lawsuit filing, the process for their appointment violated MCI's Bylaws, and that MCI did not review or request access to Debtor's 2007 and 2008 financial statements to determine if an operational deficit existed and was not being funded, which is a critical component to any right to reconveyance

16

asserted by MCI. Rather, the Counterclaimants allege that MCI filed the lawsuit to disrupt Debtor's operations and sales and gain an unfair advantage through a covenant that was never triggered by an election by Debtor.

MCI moves for summary judgment on the basis that the purpose behind the lis pendens and adversary proceedings was to seek reconveyance of the Property, which is a remedy provided to MCI under the Transfer Agreement. MCI also states it brought this adversary proceeding in this Court based on a general consensus of the involved parties that such a proceeding was the appropriate vehicle to address the issues relating to MCI's rights in the Property. MCI asserts the Court validated its right to file the adversary proceedings, as well as the lis pendens, when it found that MCI has a covenant that runs with the title to the Property.

As with the counterclaim for civil conspiracy, the Court finds that the Counterclaimants have shown there are genuine issues of material fact, or at least disputes as to the factual conclusions to be drawn from any undisputed facts, pertaining to the claim for abuse of process. Therefore, summary judgment must be denied.

The Counterclaimants have presented evidence supporting their factual allegations that the State Court Action, lis pendens, and adversary proceeding were filed as a result of alleged deterioration of services. However, it appears that no review of Debtor's financial statements was made prior to the commencement of litigation, and the testimony indicates that the board members may not have been actually aware if an operational deficit, the event that is necessary to provide MCI with a right to reconveyance under Article 5, in fact existed. As the Counterclaimants correctly point out, the Transfer Agreement provides specific provisions in Sections 16.1, 17.2, and 18.1 to govern upon an alleged default by Debtor, which mandates arbitration. Also, the Counterclaimants introduced evidence indicating that the board members

17

were aware of Debtor's pending sales of the Property, the board members were not elected in accordance with MCI's Bylaws, and the number and identity of all MCI members are unknown. This evidence thus lends support to the Counterclaimants' asserted inference that litigation was commenced and the lis pendens was filed to evade the contractual requirements under the Transfer Agreement and use MCI's asserted reconveyance right, which has not been triggered, to seek leverage on behalf of non-MCI entities and persons. Therefore, the Court denies summary judgment to MCI on the counterclaim of abuse of process.

### d. Slander of Title

Under South Carolina case law, a party alleging a claim for slander of title must show the publication of a false statement with malice that is derogatory to the plaintiff's title and causes special damages as a result of diminished value of the property in the eyes of third parties. Pond Place Partners, Inc. v. Poole, 351 S.C. 1, 21-22, 567 S.E.2d 881, 891-92 (Ct. App. 2002); Huff v. Jennings, 319 S.C. 142, 149, 459 S.E.2d 886, 890 (Ct. App. 1995).

In their pleadings, Beach II, Beach III, Easter Beach, Ocean Front, and Pensco assert this counterclaim on the basis of MCI's filing of a lis pendens against the Property. In moving for summary judgment, MCI argues that the filing of a lis pendens is absolutely privileged in South Carolina and cannot form the basis of an action for slander of title, and furthermore, the Counterclaimants have no standing since Debtor is the current record owner of the affected property. MCI also notes that the Court previously found that the reconveyance covenant in favor of MCI was a covenant running with the title to the Property.

At the hearing on the Motion, the Counterclaimants did not contest MCI's Motion as to slander of title, and instead, indicated they did not plan to pursue this counterclaim. Thus, the Court grants MCI's Motion as to slander of title.

### C. Conclusion

Based on the foregoing analysis, the Court grants summary judgment to MCI as to the counterclaims of intentional interference with contract and slander of title and denies summary judgment as to the counterclaims of civil conspiracy and abuse of process.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**06/01/2010**



*John E Waites*

Chief US Bankruptcy Judge
District of South Carolina

Entered: 06/01/2010