## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re, | C/A No. 09-00389-JW |
| DAUFUSKIE ISLAND PROPERTIES, LLC, | Adv. Pro. No. 09-80094-JW |
| Debtor. | Chapter 11 |
| The Melrose Club, Inc., | **ORDER** |
| Plaintiff, | |
| v. | |

Robert C. Onorato, in his capacity as Chapter 11 Trustee for the Estate of Daufuskie Island Properties, LLC; Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989; William R. Dixon, Jr. and Gayle Bulls Dixon; AFG, LLC; Carolina Shores, LLC; Beach First National Bancshares, Inc. d/b/a Beach First National Bank; Beach Cottages II, LLC; Pensco Trust Company, Inc.; The Beach Cottages, LLC; The Greenery, Inc.; Coastal Connections, Inc.; Beach Cottages III, LLC; Easter Beach Villas, LLC; and Ocean Front Villas, LLC,

Defendants.

The Melrose Club, Inc.,

Plaintiff,

v.

DAUFUSKIE ISLAND PROPERTIES, LLC; William R. Dixon, Jr.; Gayle Bulls Dixon; Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989,

Defendants,

of whom Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989, is

Third Party Plaintiff,

v.

William R. Dixon, Jr.,

Third Party Defendant.

This matter comes before the Court on the motions for summary judgment ("Motions") filed by Carolina Shores, LLC ("Carolina Shores"); William R. Dixon, Jr. ("William Dixon" or "Dixon"); Beach Cottages II, LLC ("Beach II"), Beach Cottages III, LLC ("Beach III"), Easter Beach Villas, LLC ("Easter Beach"), and Ocean Front Villas, LLC ("Ocean Front"); Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989 ("CFT"); Pensco Trust Company, Inc. ("Pensco"); Beach First National Bancshares, Inc., now known as BNC Bank ("Beach First"); and Robert C. Onorato, as Chapter 11 Trustee for Debtor ("Trustee").  The Melrose Club, Inc. ("MCI") filed a response to the Motions. This Court has jurisdiction over the proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

In this bankruptcy case, Debtor, as a debtor-in-possession, and now the Trustee have sought to reorganize the business of Debtor and maintain value for the benefit of creditors by continuing sales and the operation of resort facilities.  These efforts have proven problematic due to a downturn in the national economy and litigation brought by MCI regarding a certain Transfer Agreement and a related recorded Memorandum of Agreement (as defined herein). The record demonstrates that both new financing sources and buyers of assets require the elimination of the Transfer Agreement and Memorandum of Agreement as an encumbrance on title as a condition for any investment.  Therefore, much of the litigation in this case has revolved around the simultaneous seeking of new capital or the sale of assets and interpreting the effect of the Transfer Agreement in those contexts.  During the course of the case, the Court has been presented with a variety of issues, arguments, and facts related to the Transfer Agreement in a somewhat piecemeal manner, often in a summary fashion and on an expedited basis due to the emergency nature of the circumstances and need to avoid further financial deterioration of

Debtor.  The result has been a series of orders that have been narrow in scope and purpose and often based upon limited presentations.

Having now reached the stage of the completion of discovery in this consolidated adversary proceeding, the Motions and responses before the Court represent a more complete presentation by the parties of relevant facts and law and provide the Court with a better perspective for determination of critical issues. Therefore, pursuant to Rule 52, Fed. R. Civ. P., which is made applicable to this proceeding by Rule 7052, Fed. R. Bankr. P., the Court makes the following Findings of Fact and Conclusions of Law.[1]

## FINDINGS OF FACT

### A.    The Bankruptcy Case

1.    On January 20, 2009, Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., the "Bankruptcy Code").  Debtor operated as a Chapter 11 debtor-in-possession until the Trustee's appointment in this case.

2.    On March 17, 2009, the Court entered an order granting the joint motion of the Official Committee of Unsecured Creditors (the "Creditors Committee"), Beach First, and AFG for the appointment of a trustee in this case pursuant to 11 U.S.C. § 1104.  Thereafter, on March 23, 2009, the Court entered an order approving the United States Trustee's appointment of Robert C. Onorato as Trustee for the bankruptcy estate ("Estate").

3.    Shortly before the Trustee's appointment, Debtor closed its business operations after its proposed post-petition lender withdrew its offer to provide post-petition financing, thus depriving Debtor of the necessary funding to cover its operating expenses.  Following his appointment, the Trustee was able to obtain post-petition loans for the payment of costs to

---

[1] To the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent that any Conclusions of Law constitute Findings of Fact, they are so adopted.

maintain the property owned by the Estate, to resume some of the resort operations on the property, and to market the assets owned by the Estate for sale. The Trustee has been attempting to sell the property of the Estate for approximately one year.

**B.      General Description of the Assets of the Estate**

4.      The assets of the Estate (the "Property") primarily consist of resort facilities, lodging, maintenance and support buildings and structures, and development property located on Daufuskie Island in Beaufort County, South Carolina. The Estate owns real property with improvements in the Melrose Planned Unit Development ("Melrose Plantation" or the "Melrose Property"), real property with improvements in the Bloody Point Planned Unit Development ("Bloody Point" or the "Bloody Point Property"), and real property and improvements comprising Melrose Landing, the dock and landing/departure location for Debtor and for residents and visitors to Melrose Plantation and Bloody Point.

5.      The assets of the Estate include an inn (the "Melrose Inn"), a conference center (the "Island House Conference Center"), cottages and duplexes (the "Beach Cottages"), a beach club (the "Melrose Beach Club"), two golf courses (the "Melrose Golf Course" and the "Bloody Point Golf Course"), an equestrian center, tennis courts, a pool and other structures, improvements and fixtures. The Melrose Golf Course, the Melrose Inn, the Melrose Beach Club, the tennis courts and the Beach Cottages are located on the Melrose Property. The Bloody Point Golf Course, miscellaneous maintenance buildings and structures and two unsold residential lots are located on the Bloody Point Property.

**C.      The Relevant Parties and Property**

6.      MCI was incorporated on January 20, 1995 for the purpose of owning and operating a private club for the pleasure and recreation of its members and guests. At that time, MCI owned approximately 300 acres on Daufuskie Island, which is located in Beaufort

4

County, South Carolina. Improvements on MCI's properties included, inter alia, the 52-room Melrose Inn, 37 Beach Cottages, Beach Club, golf and tennis club house, health and fitness center, equestrian center, Sportsman's Lodge, administration and maintenance facility, together with interests in the embarkation center at Salty Fare on Hilton Head Island with docks and parking ("Salty Fare"), and debarkation center at Melrose Landing on Daufuskie Island. After about a year and half, MCI reached the conclusion that it was incapable of funding the operations and essential management of its properties. Its financial condition was dire: it was struggling to meet payroll and dues and assessments were increasing, resulting in general discontent within its membership. Faced with either closing the Club or selling its properties, the MCI membership voted overwhelmingly to convey the properties to Melrose Club Management, Inc. n/k/a Daufuskie Club, Inc. ("DCI").

7.    MCI[2] conveyed its properties to DCI on or about December 30, 1996, by special warranty deed. The details of the conveyance from MCI to DCI were set forth in an unrecorded Transfer Agreement between the parties ("Transfer Agreement") and recorded Memorandum of Agreement ("Memorandum"), which have been the subject of extensive litigation in this consolidated adversary proceeding and the bankruptcy case.

8.    The purchase price for MCI's properties was DCI's payoff of a $1.2 million promissory note payable to Club Financial Corp. ("CFC"); assumption of MCI's liabilities, as defined in the Transfer Agreement; assumption of certain Additional Obligations, as defined in the Transfer Agreement; and the issuance of Club Memberships pursuant to the terms of the Transfer Agreement.

---

[2] It appears that Exhibit P to the Transfer Agreement is a membership listing for MCI as of the time of the Transfer Agreement. However, the deposition testimony of the MCI board members taken in connection with this litigation indicates that the identity and number of current MCI members is uncertain.

9.      Article 5 of the Transfer Agreement ("Article 5"),[3] entitled "Additional

Obligations," provides as follows:

> 5.1   Purchaser's Additional Obligations.  As additional
> consideration for the transfer and sale of the Assets, Purchaser agrees to
> execute, on the Closing Date, the Assignment and Assumption Agreement
> whereby Purchaser agrees to assume and fund the costs of the Additional
> Obligations pursuant to the terms and conditions recited therein.  In the
> event Purchaser, at any time from the Closing Date to the expiration of
> twenty (20) years from the Closing Date, elects to not perform the
> Additional Obligations, or any material part thereof, then Purchaser shall
> provide written notice to Seller of its election (the "Written Notice").
> Purchaser agrees to reconvey the Assets to Seller within thirty (30) days
> after the Written Notice has been received by Seller, if Seller, at its option
> in its sole discretion, notifies Purchaser, in writing within thirty (30) days
> after receipt of the Written Notice, that Seller agrees to accept such
> reconveyance. The closing of the reconveyance shall be in the same
> manner and the substantially same form of documentation as utilized for
> the Closing, and Seller shall assume all of the existing liabilities of
> Purchaser arising from its ownership and operation of the Assets, which
> liabilities shall not be greater than the Liabilities assumed by Purchaser at
> the Closing.  Purchaser agrees, for a period of seven (7) years from the
> Closing Date, that any mortgage or security agreement against the Assets
> shall only secure funding for capital improvements, replacements,
> renovations, repairs, or the operation of the Club. The parties agree that a
> memorandum setting forth the reconveyance and debt restrictions set forth
> in this Section shall be recorded against the Real Property and shall be a
> covenant running with the land and be binding on any successor or assign
> of Purchaser who acquires the Real Property.

10.     Exhibit A to the Second Amendment of the Transfer Agreement ("Exhibit A")

defines "Additional Obligations" as including the following: (i) participation in and funding of

a percentage of a beach renourishment project; (ii) **funding of all operational deficits, as**

**defined in Exhibit A, in connection with the operation of the Melrose Club facilities with**

**no assessments to the Melrose Club members**; (iii) renovation of the Beach Cottages; (iv)

repairing and replacement of the golf course irrigation system, golf cart paths and sand traps;

and (v) preparation of a business plan evaluation concerning the construction of a potential

---

[3]     To the extent applicable, references to Article 5 herein are intended to also include the recorded
Memorandum reflecting the provisions of Article 5.

conference facility, and construction of the conference facility if determined by the Purchaser to be favorable. (Emphasis Added)

11.     Exhibit A defines "Operational Deficits" as "gross receipts, minus . . . operational expenses as set forth on Purchaser's financial statements prepared in accordance with generally accepted accounting principles."

12.     The recorded Memorandum provides:

> This Memorandum is executed and filed of record to evidence the terms of Article 5 of that certain Transfer Agreement (the "Agreement") executed on September 27, 1996, as amended, between Seller and Purchaser. The specific terms and conditions in Section 5 of the Agreement (the "Restrictions") are covenants running with the land described on Schedule A hereto (the "Property"). After the date hereof, the Property shall be held, sold, and conveyed subject to the terms of the Restrictions, which shall run with the title to the Property and shall bind all parties having any right, title, or interest in the Property or any part thereof, their heirs, successors, successors-in-title, and assigns and shall inure to the benefit of Seller, unless released or terminated as provided.

> In the event Purchaser, at any time from the date of this Memorandum to the expiration of twenty (20) years from the date of this Memorandum, elects not to perform the Additional Obligations, as defined in the Agreement, or any material part thereof, then Purchaser shall provide written notice to Seller of its election (the "Written Notice"). Purchaser agrees to convey the Property to Seller within thirty (30) days after the Written Notice has been received by Seller if Seller, at its option in its sole discretion, notifies Purchaser in writing within thirty (30) days after receipt of the Written Notice that Seller agrees to such reconveyance. The closing of the reconveyance shall be in the same manner and the substantially same form of documentation as utilized for the Closing, and Seller shall assume all of the existing liabilities of the Purchaser arising from its ownership and operation of the Assets, which liabilities shall not be greater than the Liabilities as defined in the Agreement, assumed by the Purchaser at the Closing.

> Purchaser agrees, for a period of seven (7) years from the date of this Memorandum, that any mortgage or security interest against the Assets, as defined in the Agreement, shall only secure funding for capital improvements, replacements, renovations, repairs, or the operation of the Club, as defined in the Agreement.

13.     In this proceeding, the parties have stipulated that Article 5 and its related exhibits and the recorded Memorandum are not ambiguous and should be enforced according to the plain meaning of their terms.

14.     Article 3 is entitled <u>Club Memberships</u>.  Section 3.1 provides in pertinent part:

> <u>Club Memberships</u>.  Purchaser agrees to offer a Club Membership in the New Club to each Member of Seller on the Closing Date pursuant to the terms and conditions set forth on <u>Exhibit B</u> attached hereto.  The Club Membership in the New Club, to be established by Purchaser, shall be evidenced by a new membership certificate to be issued in the name of the Member.  Purchaser acknowledges that the Member shall not be required to pay any additional initiation fee, initiation deposit, or member contribution for the issuance of the Club Membership….  The Member shall be entitled to the privileges, use, and enjoyment of all the club facilities located on the Real Property, subject to the terms of the bylaws and rules and regulations of the New Club (the "New Club Bylaws") established by Purchaser.  As provided in <u>Exhibit B</u>, the Member shall be responsible for the payment of dues and charges as periodically established by Purchaser, subject to the restrictions in <u>Exhibit B</u>, but in no event shall the Club Member be required to pay any assessment to remain a Member and the Member may resign at any time. ….

15.     Article 14 is entitled <u>Purchaser's Covenants, Representations, and Warranties</u>.

Section 14.1.4 of the Transfer Agreement outlines the purchaser's obligations:

> <u>Purchaser Operations</u>.  Purchaser covenants to (i) operate the New Club from the Real Property in a manner materially consistent with the operation of the Club as it is currently operated, as modified by the New Club Bylaws and including resort guests' play and usage of the facilities, or pursuant to the operational standards of comparable golf and resort facilities operated by affiliates of Purchaser, (ii) maintain in good condition the Assets, (iii) fund and pay all operational deficits generated by Purchaser, (iv) not assess any Member any amount for operational or capital expenditures, and (v) honor the Club Memberships granted to the Members, which Club Memberships shall be binding on any subsequent owner of the Real Property.

16.     Section 14.1.6 of the Transfer Agreement provides:

> <u>Subsequent Assignments of the Assets</u>.  Notwithstanding anything in this Agreement to the contrary,  Purchaser shall not, without Seller's express prior written consent, which consent will not unreasonably be withheld, transfer, or agree to transfer, in any manner, all or substantially all of the

Assets, except to (i) any person whose net worth (determined in accordance with generally accepted accounting principles) is not at least as great as that of Purchaser immediately after the transfer of the Assets to Purchaser pursuant to this Agreement, and (ii) a person who has experience and a quality reputation in the club and resort industries. For all purposes of this Agreement, the term "person" shall be construed as broadly as possible and shall include, without limitation, any natural person, corporation, company, limited liability company, general partnership, limited partnership, limited liability partnership, unincorporated association, joint venture, sole proprietorship, business trust, or other entity, in each case whether or not for profit. **Notwithstanding the above, Purchaser may sell portions of the Assets in the ordinary course of business, provided that the sale of said Assets do not materially impact the facilities provided to the Members or the operation of the Club.**

(Emphasis added).

17.    With respect to a default by either party, the Transfer Agreement provides:

16.1.    Event of Default.  Except as otherwise expressly provided herein, either party hereto shall be deemed to be in default of this Agreement if such party fails or refuses to comply with the terms and conditions set forth herein for any reason other than the prior termination of this Agreement pursuant to a right to so terminate expressly set forth in this Agreement and said default continues for a period of thirty (30) days after written notice from the nondefaulting party to the defaulting party specifying the default . . . .

. . . .

17.2.    Seller's Remedies After Closing.  Except as otherwise provided in this Agreement, upon the occurrence of an Event of Default by Purchaser after Closing which is not cured within the time permitted, Seller shall be entitled to any remedy available at law or in equity, including specific performance, as determined by the arbitration proceedings in Article 18.

Section 18.1 provides that "[a]ny controversy arising out of, or relating to, this Agreement, or the breach thereof, shall be settled by binding arbitration" and outlines the terms for any arbitration proceeding between the parties.

18.    In 2002, DCI and Debtor entered into an agreement for the transfer of the assets previously transferred by MCI to DCI pursuant to the Transfer Agreement.  On May 31, 2002, at the request of DCI, MCI executed an Estoppel Certificate, which provided that MCI consented to the transfer to Debtor and that Debtor assumed the obligations under the Transfer Agreement.  In the Estoppel Certificate, MCI acknowledged:

> Included in the Transfer Agreement was specific obligations on the part of DCI which were defined as "Additional Obligations" in [Article 5].  Since the consummation of the Transfer Agreement, DCI has expended in excess of $45,000,000.00 for capital improvements, replacements, renovations, repairs and operations of the Club, a portion of which expenditures has been borrowed and is evidenced by a promissory note and secured by a mortgage against certain real property, including the Real Property as defined in the Transfer Agreement.
> …
> The Transfer Agreement is in full force and effect, and DCI is not in default under any terms or provisions of the Transfer Agreement.  No event has occurred which, with the passage of time or giving of notice or both, would constitute a default by DCI under the Transfer Agreement….
> …
> [MCI] acknowledges that (i) certain of the assets being transferred by DCI to [DIP] … include the Assets as defined in the original Transfer Agreement, and (ii) the rights and corresponding obligations of DCI will be assigned to [DIP] by DCI as part of this overall acquisition of assets and that effective with the closing, [DIP] will step into the shoes of DCI and assume the obligations under the Transfer Agreement….
> …
> [MCI] acknowledges that as part of the acquisition of assets by [DIP] from DCI, [DIP] will be assuming a portion of the indebtedness referenced hereinabove in the General Narrative, which indebtedness exists and secures funding for capital improvements, replacements, renovations, repairs and operations of The Club based upon representations made by DCI to [MCI] and without independent investigation or confirmation.

19.    Debtor, the current owner of the Property except as indicated below, is a limited liability company with William Dixon and Gayle Bulls Dixon (collectively, the "Dixons") serving as its two members.

Case 09-80094-jw   Doc 258   Filed 06/30/10   Entered 06/30/10 09:14:44   Desc Main
Document     Page 11 of 37

20.     William Dixon filed a proof of claim in the amount of $34,692,660.58 based on a $30 million promissory note executed by Debtor in June 2002, which was secured by a mortgage executed in April 2008.

21.     Beach First holds a first priority lien on the assets of the Estate to secure post-petition loans made to the Trustee in April, May, and June 2009.  The principal amount of the loan, which is a participation loan with Tidelands Bank, is $1.5 million.  Beach First has also filed a proof of claim in the amount of $6,417,614.42 based on a third mortgage and security interest, executed in June 2008, on portions of the Property owned by Debtor.

22.     Carolina Shores has filed a proof of claim in the amount of $27,750,128.51 based on a junior mortgage and security interest, as assigned by the CFC, on portions of the Property owned by Debtor.  In March 2001, DCI executed a Subordinate Cash Flow Mortgage and Security Agreement in favor of CFC, which was secured by a portion of the assets, and recorded in May 2002.  The CFC Mortgage encumbered a portion of the assets that are the subject of this consolidated adversary proceeding and acknowledges that the CFC Note evidences the loan from CFC to fund capital improvements, replacements, renovations, repairs, and the operations of the mortgaged Property.  On May 31, 2002, CFC executed an assignment of the note and mortgage to Carolina Shores, and Debtor executed an Assumption Agreement, in which it assumed the obligations of the CFC note and mortgage.  Also in May 2002, Debtor executed a note in favor of Carolina Shores, which was secured by the CFC assigned mortgage.

23.     CFT is the record owner of Salty Fare, which was transferred to it by Debtor in April 2007 for a purchase price of $5 million.  At the time of the transfer, CFT and Debtor entered into a commercial lease agreement providing for Debtor's continued use and maintenance of Salty Fare.  The lease agreement provides for a term of 120 months, with

Debtor having two options to extend the term of the lease for periods of five years each. The lease agreement further provides for monthly rent in the amount of $33,333.33, with Debtor also being responsible for all costs associated with repair, maintenance, operation, and utilities, as well as taxes and certain insurance costs. On June 2, 2009, this Court entered an order authorizing the Trustee's rejection of the commercial lease agreement. The Dixons hold an option to purchase Salty Fare.

24.     Beach II is the record owner of a portion of the Property previously transferred from DCI to Debtor.[4] Beach II has filed a claim for $43,067.51 in the bankruptcy case based on rental management revenue and an unauthorized loan made to Debtor in June 2008.

25.     Beach III is the record owner of a portion of the Property previously transferred from DCI to Debtor.[5] Beach III has filed a claim for $781,935.31 in the bankruptcy case based on rental management revenue and a series of promissory notes secured by the portion of Property owned by Beach II.

26.     Pensco was joined in this adversary as the holder of mortgages on property owned by Beach III, executed in May 2009 to secure June 2008 promissory notes. Pensco characterizes itself as a passive custodian on behalf of third-party individuals who hold the promissory notes.

27.     Easter Beach holds a mortgage on property owned by Beach II, executed in May 2009 to secure an August 2005 promissory note.

28.     Ocean Front holds a mortgage on property owned by Beach III, executed in May 2009 to secure a May 2006 promissory note.

---

[4] Debtor transferred certain lots to The Beach Cottages, LLC in 2003, who subsequently conveyed the lots to Beach II in 2005. Debtor also directly conveyed certain lots to Beach II in 2006.

[5] Beach III acquired title to the portion of the Property from Debtor in 2006.

D.        <u>Litigation</u>

29.       Prior to the commencement of certain state court litigation described below, counsel for MCI sent a letter to Dixon dated July 25, 2008, in which he stated MCI believed that Debtor was in default of its obligation to fund operational deficits, as required by the Additional Obligations provision referenced in Article 5.  MCI counsel further stated that other provisions of the Transfer Agreement, including Section "14.1.4 Purchaser Operations (operate consistent with current operations as modified by New Club Bylaws and maintain assets in good condition)" and Section "14.1.6 Subsequent Assignment of Assets (transfer restrictions and consent requirements)," may be breached.  By letter dated August 22, 2008, counsel for Debtor responded that Debtor denied MCI's allegations that the operational deficit funding requirement, or any other provisions of the Transfer Agreement, had been breached.  Counsel for MCI replied in a letter dated August 28, 2008, stating that any agreements to transfer the Melrose Inn, Melrose Utility, or Salty Fare were not in the ordinary course of business and such sales would violate the Transfer Agreement.  MCI's counsel further stated:

> We are of the opinion that funding of Operational Deficits from the proceeds of past or future sales of Assets without the Club's prior written consent is a breach of the Transfer Agreement's Additional Obligations requirement.  The actions (and failure to act) and other related conduct of [Daufuskie Island Properties, LLC] are tantamount to an election that gives the Club certain rights and remedies under § 5.1 and other provisions of the Transfer Agreement."

30.       According to the evidence presented to the Court, MCI has not requested Arbitration under Article 18 to resolve allegations of Debtor's default under Article 14.

31.       MCI commenced a state court action, <u>The Melrose Club, Inc. v. Daufuskie Island Properties, LLC</u>, C/A No. 2008-CP-07-3647, in the Court of Common Pleas of South Carolina for Beaufort County (the "State Court Action") on September 25, 2008, against Debtor, the Dixons, DCI, and CFT.  In its amended complaint, MCI sought declaratory

judgment that (1) Debtor failed to fund operational deficits, which acted as an election under Article 5, required Debtor to give MCI written notice of the election, and gave MCI a right to repurchase; and (2) the sale of Salty Fare to CFT, the Dixons' option to purchase Salty Fare, the Melrose Inn agreement to transfer, and any other sales that have a material impact on the facilities or operations of the Club were and are not valid and are subject to MCI's rights.  In connection with the State Court Action, MCI filed a Notice of Lis Pendens against the Property. The Trustee filed a Notice of Removal of the State Court Action on June 17, 2009, which commenced Adversary Proceeding No. 09-80095.

32.     The moving parties have alleged that the pre-petition filing of the State Court Action and Lis Pendens halted significant pending sales of portions of the Property,[6] limited Debtor's income, caused the filing of the bankruptcy case, and forced Debtor's failure to fund ongoing operations.

33.     MCI commenced Adversary Proceeding No. 09-80094[7] in this Court on June 15, 2009, and amended its complaint on August 21, 2009, alleging that (1) Debtor failed to perform the Additional Obligations as provided for in the Transfer Agreement; (2) the failure to fund [operational deficits] constitutes an election not to perform the Additional Obligations under Article 5 of the Transfer Agreement; (3) MCI has the right to repurchase the Property subject to the terms of Article 5 and the Memorandum;[8] and (4) the Defendants' rights, title,

---

[6] Based on the evidence before the Court, prior to the filing of the State Court Action and Lis Pendens, Debtor had a draft contract for the sale of the Melrose Inn to Melrose Resort Development Group, LLC for $13 million, and a letter of intent from Vinings Marine Group, LLC for the purchase of Melrose Landing for $6 million.

[7] In accordance with an agreement between the parties to consolidate Adv. Pro. Nos. 09-80094 and 09-80095, the court entered an Order on October 9, 2009, consolidating these two adversary proceedings.

[8] Throughout the course of the bankruptcy proceeding, MCI has repeatedly asserted that its purchase price for reconveyance of the Property should be $4.8 million.

and interests in the Property still owned by Debtor or previously transferred by Debtor are subordinate to MCI's rights under Article 5 and the Memorandum.

34.     On December 21, 2009, the Court entered an Order (the "December 21 Order") on various motions for summary judgment, and the responses and objections thereto, submitted by the parties, finding that MCI's reconveyance right set forth in Article 5 of the Transfer Agreement and the recorded Memorandum of Agreement is a covenant running with the land. The Court further found that Debtor's alleged failure to fund operational deficits and the proposed sale of Debtor's assets do not constitute an election not to perform under Article 5 of the Transfer Agreement, and thus, the reconveyance remedy in favor of MCI described therein had not been triggered at that time.[9]

35.     On January 7, 2010, the Court entered an Order in the bankruptcy case authorizing the proposed sale of substantially all the estate's assets pursuant to § 363(b)(1) and (f) to Montauk Resorts, LLC ("Montauk") free and clear of liens, claims, encumbrances, and other interests, including the remaining Article 5 covenant, and approving the assumption and assignment of certain unexpired executory contracts and leases ("Sale Order").[10]   The purchase price was $49.5 million.  Subsequently, in connection with the proposed sale to Montauk, the Court entered an Order Approving Settlement Between the Estate and MCI.  To date, the proposed sale has not closed due to Montauk's inability to complete its financing.

36.     Due to Montauk's failure to close and Debtor's lack of funding to preserve, protect, and operate its business, on May 7, 2010, the Court entered an Order in the bankruptcy

---

[9] By Order entered April 2, 2010, the Court denied MCI's motion to alter or amend the December 21 Order.

[10] The Court denied MCI's motion to vacate, or in the alternative, to alter or amend the Sale Order by order entered May 3, 2010.

case authorizing the sale of substantially all of the estate's assets at auction free and clear of liens, claims, encumbrances and other interests, including the remaining Article 5 covenant, and approving the assumption and assignment of certain unexpired executory contracts and leases ("Auction Order").[11]

## CONCLUSIONS OF LAW

### A.    Standard of Review

Pursuant to Rule 56(c), Fed. R. Civ. P., made applicable to this consolidated adversary proceeding by Rule 7056, Fed. R. Bankr. P., summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial.  Listak v. Centennial Life Ins. Co., 977 F. Supp. 739, 743 (D.S.C. 1997) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986)).  Summary judgment is not appropriate "[e]ven if there is no dispute as to the evidentiary facts," but the "ultimate factual conclusions to be drawn from them are in dispute." Lamb v. Qualex, Inc., 33 F. App'x 49, 53 (4th Cir. 2002).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).  Upon making this showing, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating that a genuine issue exists for trial.  Fed. R. Civ. P. 56(e); Campbell v. Capital One Bank (In re Broughton), C/A No. 99-06953-W, Adv. Pro. No. 00-80143-W, slip op. at 4-5 (Bankr. D.S.C. Mar. 20, 2001).

---

[11]    The Auction Order provided that additional terms had to be agreed upon or ordered before the auction could be held and such terms would be addressed by supplemental or further order.

"If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial." <u>Listak</u>, 977 F. Supp. at 743 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986)).   In considering a motion for summary judgment, "[a]ll evidence must be viewed in the light most favorable to the nonmoving party."  <u>Listak</u>, 977 F. Supp. at 743 (citing <u>Perini Corp. v. Perini Constr., Inc.</u>, 915 F. 2d 121, 123 (4th Cir. 1990)).

**B.**     **<u>Arguments of the Defendant Moving Parties</u>**

In its Amended Complaint, MCI asks the Court to enter an order declaring that (i) Debtor and the successor Trustee have failed to perform the Additional Obligations under the 1996 Transfer Agreement; (ii) such failure to perform constitutes an election not to perform the Additional Obligations under Article 5; (iii) MCI has the right to repurchase the properties subject to the terms of Article 5 and the Memorandum of Agreement; (iv) the rights, title and interests of all Defendants in this action are subject to and subordinate to MCI's rights; and (v) MCI is entitled to such other and further relief as the Court deems just and proper.

In the Motions before the Court, the Defendant moving parties assert various arguments, some of which are common to all and some of which are unique to the individual parties, as to why their rights and interests are not subject to those of MCI.

**a.**   **<u>Changed Circumstances/Public Policy/Forfeiture</u>**

The covenants set forth in Article 5 and the recorded Memorandum place substantial affirmative obligations on Debtor related to improving, repairing, and maintaining the Property, and provide MCI with the remedy of choosing reconveyance if Debtor elects not to fulfill those

affirmative obligations.[12] It is undisputed that the only outstanding covenant is the covenant to fund all operational deficits in connection with the operation of the Melrose facilities with no assessments to the Melrose Club Members; the other covenants have been fully performed. The moving parties assert that the remaining Article 5 covenant regarding the Property should be annulled pursuant to the South Carolina doctrine of changed conditions or changed circumstances. The moving parties who hold title or mortgages to non-estate assets further argue that the Court should recognize the annulment of the remaining Article 5 covenant as to all property alleged to be subject to the Transfer Agreement.

Under South Carolina law, a covenant can be annulled, viewed as unenforceable, and determined ineffective and invalid if such a significant change occurs with regard to the servient property so as to render a covenant valueless to the covenantee and oppressive and unreasonable as to the covenantor. Dunlap v. Beatty, 239 S.C. 196, 122 S.E.2d 9, 15 (1961); see also Menne v. Keowee Key Prop. Owners Ass'n, Inc., 368 S.C. 557, 564, 629 S.E.2d 690, 694 (Ct. App. 2007). Dunlap and Menne further indicate the doctrine of changed circumstances may be used to obtain affirmative relief from a covenant. Dunlap, 122 S.E.2d at 15-16; Menne, 629 S.E.2d at 694. Similarly, in T2 Green, LLC v. J.L. Abercrombie, this Court stated that "(a) party to a contract [covenant] may likewise be excused from performance when the object or the purpose of the contract [covenant] is frustrated because of changed conditions supervening during the term of the contract." 363 B.R. 753, 769 (Bankr. D.S.C. 2006). There is no hard and fast rule as to when changed conditions have defeated the purpose of a covenant. Inabinet v. Booe, 262 S.C. 81, 84, 202 S.E.2d 643, 645 (1974). Rather, each case must rest on the facts and equities of the situation as they are presented. Double Diamond Props., LLC v. BP Prods. N.A., No. 07-1539,

---

[12] The Court notes for purposes of clarification that the remaining Article 5 covenant is an affirmative covenant, as opposed to a restrictive covenant as the Sale Order and Auction Order mischaracterized it.

2008 WL 2035617, at *318 (4th Cir. 2008).

In the January 7, 2010 Sale Order authorizing the proposed sale of the assets to Montauk and the subsequent May 7, 2010 Auction Order authorizing a sale of the assets by auction, the Court found that one rationale for the sale authorization was § 363(f)(1), which permits the sale of property free and clear of an interest of another entity if applicable non-bankruptcy law permits the sale of the property free and clear of the interest.  In granting the Trustee authorization for the sale under § 363(f)(1), the Court relied on the doctrine of changed conditions or changed circumstances, finding that in the context of a sale, the circumstances of the Property had changed so dramatically so as to render the untriggered remaining Article 5 covenant valueless to MCI, the covenantee, and oppressive and unreasonable to Debtor, the covenantor.[13]

The moving parties now argue that the Court's findings and reasoning in the Sale and Auction Orders should be applied in the context of this adversary proceeding to declare MCI's remaining Article 5 covenant a nullity.  The moving parties also note that MCI's filing of the State Court Action and Lis Pendens prevented Debtor from being able to obtain financing, sell any portion of the Property, or otherwise generate funds to operate the facilities, which in turn, led to the unforeseen circumstance of Debtor's bankruptcy filing.  CFT and the Trustee further argue summary judgment is appropriate on the grounds that the covenant is unenforceable because it contravenes public policy and a reconveyance, under MCI's proposed terms, would result in a forfeiture of Debtor's improvements and repairs over the last thirteen years, which amount to more than $45 million in value.

MCI objects on the basis that the application of the changed circumstances doctrine

---

[13] In arguing the motion to alter or amend, MCI appeared to recognize that § 363(f)(4) may provide a separate authority for the sale free and clear of liens.

requires that the covenant be valueless to the covenantee and factual issues exist as to the value of its reconveyance right. MCI contends that if the remaining Article 5 covenant has such an adverse effect on the moving parties, it must have value. To this end, MCI submits that the finding of a forfeiture is not warranted because no repurchase price has been determined, there is no evidence to indicate that the reconveyance price suggested by MCI, $4.8 million, would be an insufficient price, and a change in value of property is not adequate grounds for an annulment of a covenant. MCI also argues that there are no facts showing a radical change in the Property. Further, MCI asserts that the findings and reasoning contained in the Sale and Auction Orders are based on the context and circumstances of the sale of the assets and should not be applied in this consolidated adversary proceeding.

It is undisputed that the purpose of the Additional Obligations was to improve and preserve the condition, quality, and value of the Property in part for the benefit of MCI members and to avoid ongoing assessments against the members for any deficits arising from the operation of the Club facilities. At the time of the 1996 conveyance, it was clear that the members of MCI did not have the resources to maintain and improve the Property. MCI was struggling financially and had concluded that, without an increase in assessments, it would either have to sell or disband the Club facilities. In that context, MCI sought affirmative covenants which promise future action regarding the Property. Therefore, it makes sense to examine any change in the character of the Property to determine whether the affirmative covenants continue to serve their purpose or whether they should be nullified according to the criteria of South Carolina law. After such an examination, the Court concludes that the requirement for change in the character of the Property appears to be met in several ways.

During the years immediately after the recordation of the Memorandum, the Property's

character was significantly improved by new investment. As obliged by the Additional Obligations, substantial capital improvements and repairs were made which changed the physical condition of the Property. By 2002, the Property was changed by the completion of the beach renourishment project, renovation of the beach cottages, repairs and replacement of the golf course irrigation system, golf cart paths, and sand traps, and construction of a conference facility. In 2002, by executing the Estoppel Certificate, MCI expressly acknowledged that, prior to that time, the Purchaser, DCI, spent more than $45 million in improvements, repairs, and maintenance. Such extensive and costly improvements should be viewed as a significant change to the Property. Furthermore, the completion of these improvements establishes that the Additional Obligations were successful in meeting their purpose, namely to enhance and protect the assets and amenities that benefited MCI's members.

Since the commencement of the litigation between Debtor and MCI, however, the condition of the Property has significantly worsened. The undisputed evidence indicates that the physical condition of the Property, including the facilities and amenities, which are the subject of this litigation, has considerably declined and continues to deteriorate due to lack of maintenance and funding. For all practical purposes, the facilities and amenities have virtually shut down. The general store has closed, and the Bloody Point community has been abandoned. The Melrose Inn has been padlocked and is closed, and the Melrose Golf course is being operated on a very limited basis. The conditions have clearly changed, and the objectives of the remaining covenant running with the land—the maintenance and preservation of Club facilities and the funding of Operating Deficits of the Melrose facilities—clearly are not being furthered. As hearings before this Court have indicated, the filing of the Lis Pendens in the title record of the Property and subsequent litigation by MCI are, at least, contributing factors to the Estate's inability to obtain

operating funds through new sales or financing. [14] Under any number of circumstances, the condition of the Property can be viewed as radically changed. [15]

Moreover, the remaining Article 5 covenant to fund all operational deficits of the Melrose facilities without assessments to MCI members has no actual value if the facilities themselves are sold, shut down, or inoperable.  As stated herein and in prior orders, since an election has not been made, MCI's reconveyance right is not operative and therefore has no actual present value. In addition, the remaining Article 5 covenant is, by its very terms, dependent upon the continued existence of the Club facilities.  However, a review of the language of the Transfer Agreement indicates that any obligation to continue to operate a Club and provide benefits to members required by the Transfer Agreement is clearly not a covenant that runs with the land.[16] MCI contracted for a remedy other than a right of reconveyance upon any failure or refusal of the Purchaser to maintain the benefits of the Club, maintain the assets in good condition, fund operational deficits, honor the Club memberships or upon an assessment of members for operational or capital expenditures, and did not provide for such remedy to run with the land. While MCI may assert a default of Article 14, as it did in the letter of its counsel on July 25,

[14] Prior to these filings, Debtor had sales pending for significant value that would have generated money to fund Debtor's operations, and pursuant to Dixon's testimony, there were no existing operational deficits before the State Court Action and Lis Pendens were filed.  Thus, MCI's filings affected title to the Property and may have forced Debtor's alleged failure to fund operations. It is undisputed that the removal, cancellation, or voiding of MCI's claimed encumbrance has been a condition of all new proposed lenders and purchasers who have appeared in this proceeding.

[15] Other changes cited by the moving parties as meeting the requirements of South Carolina law include a change in the manner in which the Property was operated and changes to MCI itself. Since 1996, there was a substantial change in the business operating model which affected how Debtor used the Property involving a switch from a single owner-operator method to a model involving the sale and lease of select assets to others with more expertise and experience in operating for the benefit of the Property. In addition, MCI's change from an entity which operated the Property to an entity which due to a loss of members and lack of authority and resources now exists in name only (but which nevertheless asserts a threat of reconveyance) also substantially affects the Property.

[16] As stated in the Order of December 21, 2009, the Transfer Agreement was not recorded, the recorded Memorandum does not reference the covenants contained in Articles 3 and 14 and, unlike Article 5, the terms of those Articles did not express an intent that the covenants contained therein run with the land.

22

2008, which it used as one of the bases for filing the State Court Action and the Lis Pendens, MCI has not asserted any remedy for default under Article 17 or 18 and has not asserted a right to specific performance. Furthermore, the Court has authorized the sale of the Property free and clear of the obligations contained in Articles 3 and 14.[17] At the present time, it is undisputed that the Trustee has no funds available to maintain the Property and operate the Club facilities. If the Club facilities are not operating as envisioned by the Transfer Agreement, there can be no deficits generated therefrom. Therefore, since the only remaining obligation in Article 5 is the funding of operational deficits, the purpose and importance of this remaining obligation is defeated if the benefits contained in Articles 3 and 14, which include maintaining the amenities, limiting assessments, and honoring Club memberships, are not continually provided to MCI members.

Finally, the covenant is also unduly oppressive to Debtor and the Estate because the continuation of the remaining Article 5 covenant and reconveyance right has blocked, and will continue to block any realistic means of recovering value for the Estate and creditors, including MCI, by precluding sales or refinancing and thereby eliminating funding to avoid the deterioration of the Property and facilities.

Based on the changed circumstances to the nature of the Property and the finding that those changes have rendered the covenant requiring the funding of operational deficits valueless to MCI and oppressive to Debtor and the Estate, the Court concludes that the covenant should be

---

[17] The obligation to operate the Club facilities cannot be specifically performed due to an absence of funds. Since MCI did not link the Article 14 covenants sufficiently to the subject Property, the Property may be transferred free and clear of any specific performance claim. It further appears that MCI's remedy under Article 14, if arbitrated, would give rise to a right to payment under 11 U.S.C. § 101(5) and is dischargeable in the bankruptcy case.

nullified at this time.[18]

Additionally, after the full development of the facts in this case, the Court finds that public policy reasons support this conclusion. Certainly, there are substantial policy considerations underlying the Sale and Auction Orders, wherein the Court reasoned that the sale of the assets free and clear of liens and interests is necessary to protect the value, development, and commerce of the Property and all parties asserting an interest in the Estate. South Carolina law has confirmed that consideration of equitable doctrines is appropriate when determining whether to enforce a restrictive covenant. Buffington v. T.O.E. Enters., 383 S.C. 388, 393, 680 S.E.2d 289, 291 (2009). Article 5 of the Transfer Agreement specifically envisioned large capital investments and improvements to the Property, and appears to have provided a reconveyance remedy primarily to ensure that performance. As stated, with the exception of the ongoing agreement to fund operational deficits, those obligations have been fulfilled. The Court finds it would be inequitable to continue to enforce the remaining Article 5 covenant in light of the substantial fulfillment of the Additional Obligations, the corresponding lack of value of the sole remaining Article 5 covenant to MCI, and the ongoing deterioration of the assets. To allow MCI to obtain the Property for the low price it suggests and free of Defendants' liens would be unjust, contrary to public policy, and amount to a forfeiture.

Accordingly, the Court grants summary judgment to the moving parties and extends the reasoning utilized in the Sale and Auction Orders and as further stated herein to conclude the remaining Article 5 covenant and corresponding reconveyance right should be nullified.

### b.  Consideration

CFT and the Trustee also move for summary judgment on the basis that the remaining

---

[18]  It would be futile to insist that every vestige of operations die or that every nickel of value be expended before realizing this circumstance and providing for nullification.

Article 5 covenant is unenforceable because it is a separate contract within the Transfer Agreement but lacks independent consideration.  In response, MCI argues that there is no need for special consideration to be apportioned to separate provisions of a contract.

The Court denies summary judgment to the moving parties on this ground at this time. For purposes of Debtor's emergency motion to reject the Transfer Agreement as an executory contract under § 365  ("§ 365 Order"), the Court, in denying the Motion, held, as one of several alternate findings, that Article 5 could be construed as a separate, independent agreement from the Transfer Agreement.[19]  However, the Court notes the § 365 Order expressly stated that due to the emergency and summary fashion of that order, the findings with respect to the parties were made "for the limited purpose" of determining the § 365 motion and were "not intended to bind the parties in other contexts." Consistent with its interpretation of the Transfer Agreement stated herein, it is appropriate to consider Article 5 in the context of its relationship to other provisions of the Transfer Agreement. Therefore, Article 5 does not fail for lack of independent consideration because "no special consideration need be singled out or apportioned for each separate provision in a contract."  Furse v. Timber Acquisition, 303 S.C. 388, 390, 401 S.E.2d 155, 156 (1991) (finding that no independent consideration was necessary to support an option to purchase provision in a lease).

### c.  No Trigger

The Trustee argues that the covenant has not been triggered by an election pursuant to the terms of Article 5, and even if it were, MCI is not ready, willing, or able to purchase Debtor's assets.  In a related argument, Carolina Shores argues that MCI's asserted priority is based upon a hypothetical reconveyance, which should not be considered as ripe.  MCI restates the

---

[19] In large part, the reasoning behind this finding was that Article 5 is so different in nature and remedy from the default and remedy sections applicable to other provisions of the Transfer Agreement.

arguments previously presented to the Court regarding the interpretation of "election" in the context of Article 5. MCI also states that at this time, it only seeks a declaration of its rights, and until its rights are determined, it is premature for it to seek performance of the reconveyance right. MCI also argues that factual issues exist as to its ability to repurchase since no repurchase price has been definitively established.

As stated in the December 21 Order, Debtor's alleged failure to fund all operational deficits and the proposed sale of Debtor's assets do not act as elections under Article 5 so as to trigger MCI's reconveyance right.[20] The language of Article 5, which the parties have agreed is unambiguous, clearly requires that Debtor affirmatively elect not to perform the Additional Obligations of Article 5 and provide written notice to MCI of that election. The term "elect" may be understood according to its plain and ordinary meaning and requires a voluntary choice and a willing act on the part of Debtor. See William W. Bierce, Ltd. v. Hutchins, 205 U.S. 340, 346, 27 S. Ct. 524, 525 (1907) ("Election is simply what its name imports: a choice, shown by an overt act, between two inconsistent rights, either of which may be asserted at the will of the chooser alone.").

Furthermore, according the plain language used, Article 5 does not provide a remedy for a party's insolvency or failure to perform, nor does it create an obligation to establish and operate a Club for the benefit of MCI or its members, as do Articles 3 and 14. The Court cannot rewrite the contract between the parties. See C.A.N. Enters., Inc. v. S.C. Health & Human Servs., 296 S.C 373, 378, 373 S.E.2d 584, 587 (1988) (stating that courts are "without authority to alter a contract by construction or to make new contracts for the parties" but are "limited to the

---

[20] Furthermore, although MCI's counsel alleged in its 2008 correspondence to Dixon and Debtor's counsel that funding operational deficits from the proceeds of sales or proposed sales of portions of the Property without MCI's consent is a breach of Article 5, there is no provision in the Transfer Agreement that would prohibit the payment of operational expenses or funding of operational deficits from sales of the Property that are otherwise in compliance with the Transfer Agreement.

26

interpretation of the contract made by the parties themselves"). Also, as stated by the December 21 Order, this interpretation of Article 5 is reasonable in light of the Purchaser's assumption of the Additional Obligations, which were extensive and the costs uncertain at the time the parties entered into the Transfer Agreement. Thus, if the Purchaser determined it could not meet such significant expenses, it may wish to withdraw from those obligations by voluntarily electing to not act further and to return the assets to their original status rather than later default and expose itself to a potentially more significant damage claim. The December 21 Order found that, at that time, Debtor had neither made an affirmative election nor provided written notice to MCI of any election and that the likelihood of such an election under the circumstances was extremely remote. No evidence has been presented to the Court to indicate Debtor or the Trustee have made such an election under Article 5 in the time between that order and the issuance of this Order.

The December 21 Order also concluded that a proposed sale of the assets does not trigger the reconveyance right because Article 5 plainly does not address the sale of the property and is limited to an election not to perform the Additional Obligations. Instead, a sale of substantially all of the assets, and the detailed requirements for such a transfer, is specifically addressed in Section 14.1.6. If the requirements of Section 14.1.6 are met, a transfer may occur without default or breach; however, in the event such requirements are not met, there is no language in Section 14.1.6 or Article 5 that any alleged breach is tantamount to an election to trigger the reconveyance right. Based on this reasoning, the proposed sales approved by the Sale Order and Auction Order do not constitute elections under Article 5.

Accordingly, the Court grants summary judgment to the moving parties that the

reconveyance right asserted by MCI has not been triggered.[21]

### d. Debt Restriction

Many of the moving parties—Dixon, Easter Beach, Ocean Front, Pensco, Carolina Shores, and Beach First—argue that their interests are not subject or subordinate to that of MCI pursuant to the express language of Article 5.  According to Article 5, in a reconveyance to MCI, "[MCI] shall assume all of the existing liabilities of Purchaser arising from its ownership and operation of the Assets, which liabilities shall not be greater than the Liabilities[22] assumed by Purchaser at the Closing."  Article 5 further provides that the "Purchaser agrees, for a period of seven (7) years from the Closing Date, that any mortgage or security agreement against the Assets shall only secure funding for capital improvements, replacements, renovations, repairs, or the operation of the Club."

The language of Article 5 indicates that, upon the Purchaser's withdrawal by election, MCI, as Seller, would repay the Purchaser in the same manner as it had been paid when it sold

---

[21] The December 21 Order also noted the Trustee's argument that even if MCI's right of reconveyance was triggered, MCI is neither willing nor able to purchase Debtor's assets.  There is evidence that MCI has limited funds and would have to rely on contributions from members or homeowner associations to repurchase the Property, just as it has for the payment of its attorneys' fees. However, in light of the finding that no right to reconveyance was triggered, the December 21 Order found it unnecessary to address that issue.  The Court finds no further elaboration is necessary in this Order since the right remains untriggered.

[22] Section 1.28 defines "Liabilities" as "(i) Seller's liabilities as of the Closing Date set forth on Exhibit O . . . which includes Seller's current liabilities as described therein, and (ii) Seller's obligations under the Contracts arising after the Closing Date."  Exhibit O to the Transfer Agreement lists the following as liabilities:

1. All liabilities, debts, and accounts payable set forth on Seller's financial statements as of August 31, 1996, delivered and provided to Purchaser and initialed by the parties.

2.  All debts, obligations, and accounts payable incurred by Seller in the ordinary course of business of operating the Assets through the Closing Date.

3. The amount of principle [sic] and interest outstanding under the Interim Note.

4. The obligations of Seller under the Contracts arising after the Closing Date.

5. The Contingent Liabilities attached as Schedule 1.

the Property.  However, it appears that the parties expressly anticipated additional secured debt against the Property in order to accomplish the affirmative obligations set forth in the Additional Obligations.  The so-called "Debt Restriction" provision demonstrates an intent to limit secured debt to such beneficial uses for a seven-year period and by reasonable inference implies that there was no intention to provide such a restriction on debt secured by the Property thereafter. Several of the moving parties assert their interests are represented by a debt secured by the Property that was anticipated in Article 5 and, therefore, must be recognized as valid upon any reconveyance.  These moving parties assert that it is unreasonable to interpret Article 5 as providing MCI with a priority position over their interests based merely upon a prior recordation of the Memorandum when MCI anticipated that the Purchaser would incur future secured debt on the Property and use the proceeds for its benefit.

Certain other parties argue their debts originated after the expiration of the period of restriction.  Easter Beach and Ocean Front both received mortgages in 2009 to secure notes executed in 2005 and 2006, respectively.  Similarly, Debtor executed mortgages in 2009 to evidence 2008 debts in favor of Pensco.  Beach First's proof of claim is also based on a 2008 mortgage.  Finally, Dixon received a mortgage in 2008, although the mortgage purports to secure a note executed in 2002.  Regardless, Dixon maintains that the funds he advanced to Debtor were used within the debt restriction terms for capital improvements, replacements, renovations, and operation of the Club.  These parties argue that since their respective mortgages were acquired after the expiration of the debt restriction provision, MCI would take any reconveyance of the Property subject to their debts.

Carolina Shores asserts its interest is not subordinate to MCI's rights because its debt is based on the CFC note and mortgage, which was an existing liability of DCI when Debtor

acquired the Property and when MCI executed the Estoppel Certificate.[23] The Estoppel Certificate provided that DCI had expended more than $45 million for capital improvements, replacements, repairs, and operation, a portion of which had been borrowed and secured by a mortgage against the Property; that DCI was not in default under any provision of the Transfer Agreement; that the rights and obligations of DCI under the Transfer Agreement would be assigned to Debtor; and that Debtor would be assuming a portion of the indebtedness securing funding for capital improvements, replacements, renovations, repairs, and operations.  Carolina Shores asserts its debt was acknowledged by MCI in the Estoppel Certificate as an existing liability arising from the ownership and operation of the Property.  With respect to the limitation of MCI's assumption of liabilities upon a reconveyance, Carolina Shores argues that DCI assumed all debts incurred by MCI in the ordinary course of business of operating the assets through the closing date, and therefore in the event of reconveyance, MCI would assume the liabilities of the same kind—all debts incurred in the ordinary course of business of operating the Property through that closing date.  Carolina Shores thus submits that upon a reconveyance, MCI would take the Property subject to its debt.

In response, MCI argues the terms of Article 5 capped MCI's repurchase price at the specific amount of existing liabilities assumed by DCI, which it asserts to be $4.8 million, at the time of the 1996 closing.

In reviewing this issue and the parties' arguments and assertions, the Court agrees with Defendants. Initially, there does not appear to be a factual dispute regarding whether these defendants' mortgages were either acquired after the expiration of the debt restriction or in order to fund capital improvements, replacements, renovations, repairs, or operation of the Club.

---

[23] The Estoppel Certificate, assignment of the CFC note and mortgage to Carolina Shores, and Debtor's assumption agreement were all executed on May 31, 2002.

Rather, the dispute focuses on the amount and scope of liabilities that MCI would assume upon a reconveyance.  Before reaching this dispute, however, the Court notes that MCI's contingent interest could not exercise a priority over the interests of the lienholders as long as Article 5 is not triggered.  As the Court made clear in the December 21 Order and reaffirmed in this Order, no trigger of Article 5 has occurred.

Under the terms of the Transfer Agreement, "Liabilities" is a defined term and the closing date refers to the 1996 closing.  However, by setting forth a description of debt during the seven-year period, the language of Article 5 makes clear that at the time of the 1996 closing and Transfer Agreement, MCI anticipated further secured financing of the Property for improvements, repairs, and maintenance, and there is no reason to infer that after the seven-year period expired, more funds would not be advanced to the Purchaser for uses not so controlled by the Transfer Agreement.  This interpretation is further supported by the affirmative covenants which contemplated the Purchaser's incurrence of further debt by requiring the Purchaser to fund extensive and costly obligations such as beach renourishment, operational deficits, renovation of the beach cottages, repairs and replacements of the golf course irrigation system, golf cart paths, and sand traps, and construction of a conference center.  By executing the Estoppel Certificate, MCI acknowledged that DCI expended more than $45 million for improvements, repairs, and operations, DCI borrowed new money to complete these projects, and Debtor would assume this debt upon its acquisition of the property.

Therefore, the Court finds that the language of Article 5 and the Estoppel Certificate envisioned and acknowledged that the owner of the Property had and would secure new debt with mortgages on the Property.  Even if Article 5 is read to place a numerical cap on the consideration paid to the Purchaser or the amount of liability that MCI would personally assume

31

upon a reconveyance, which the Court notes is not definitively ascertainable based on the listed liabilities in the Transfer Agreement, there is no language in the Transfer Agreement to suggest that MCI may reacquire the Property free and clear of the liens that were placed on the Property in accordance with the debt restriction's limitations or after the expiration of the debt restriction.[24]   The Court, therefore, concludes that in the event of a reconveyance to MCI, the lienholders' mortgages would continue to be secured by the Property.  No reasonable reading of the unambiguous language of Article 5 would provide that upon reconveyance, MCI would be entitled to priority over these movants' liens so as to receive a windfall—taking the Property with valuable anticipated improvements for minimal consideration and free of liens. [25]

Accordingly, summary judgment is granted to the lienholders. Furthermore, the Court finds that in the event of a reconveyance, the applicable moving parties' liens would continue to encumber the property and not be avoidable or subordinate upon an assertion of priority by MCI.

### e.  Transfer of Non-Bankruptcy Assets

Pursuant to Section 14.1.6 of the Transfer Agreement, Debtor is permitted to sell portions of the Property in the ordinary course of business as long as the sale of such an asset does not materially impact the facilities provided to MCI members or the operation of the Club.

### i.  CFT

CFT asserts that its interest is not subject to MCI's rights because the transfer of Salty Fare was a sale in the ordinary course of business and valid under Section 14.1.6, which expressly governs subsequent assignments of the assets.  CFT further provides its acquisition of

---

[24] Certain moving parties also argue that the language of Article 5 and the Memorandum only specifies the type of liabilities, as opposed to the amount, to be assumed in a reconveyance. They argue that since all existing liabilities were not known at the time of the 1996 Closing that the "no greater than" language was meant to define the type of liabilities to be assumed and therefore since their liens and interests fall within those categories of liabilities then they are exempt from MCI's assertion of priority. Based upon the ruling herein, the Court does not have to further address this argument at this time.

[25] A reconveyance of the Property subject to the mortgages would not be unfair to MCI since the valuable improvements would be part of the Property reconveyed.

Salty Fare did not have any material impact on the facilities or operation of the Club because Debtor, by virtue of its lease, retained control of Salty Fare.  Furthermore, CFT points out that in the course of the bankruptcy case, the Trustee rejected the lease, which establishes that the sale did not have a material impact on facilities or operations.  CFT also points to the deposition testimony of MCI board member Richard Silver, who acknowledged that the sale of Salty Fare was not a sale of "substantially all of the assets," and of the Dixons, who stated the sale of Salty Fare did not materially impact the facilities, and in fact, went unnoticed by MCI for fourteen months.

MCI argues that there is conflicting evidence as to whether Salty Fare was sold in the ordinary course of business in accordance with Section 14.1.6.  MCI also asserts that all of the defendants had record notice of the potential reconveyance right and knew their liens would be subject and subordinate to the terms of that right.

After reviewing the evidence in the record in the light most favorable to MCI, the Court grants summary judgment to CFT and finds that the transfer of Salty Fare was valid under Section 14.1.6.[26]  CFT has set forth ample evidence to support its allegation that the sale of Salty Fare was not of material impact and that the property was validly transferred in the ordinary course of business.  Significantly, the transfer of Salty Fare included a lease of the property back to Debtor for a term of ten years, with Debtor holding options to extend the lease for an additional period of ten years.[27]  Under the terms of the lease, Debtor is responsible for all costs associated with operation, repair, and maintenance of the Property.  Thus, despite the transfer of

---

[26] Although the December 21 Order found there was a question of fact as to this issue, that finding was reached in the context of MCI's motion for summary judgment before the discovery period concluded and based on evidence that was not yet fully developed.  The Court finds that after the completion of discovery, any material issue of fact has been eliminated.

[27] This term with extension would exceed the effective time of the remaining Article 5 covenant, which runs with the land.

title to CFT, Debtor retained control of the asset and the operations thereon.    While the

deposition testimony of both MCI and Debtor's representatives indicates that Salty Fare was

important to the operations and facilities on the island, the testimony also establishes that the

impact of the sale was neutral because the facility and operators remained the same.

Furthermore, in their deposition testimony, both the Dixons and MCI board members stated that

any alleged reduction in services on Salty Fare after the transfer was attributable solely to its

operation by Debtor and not due to a change in ownership.

In addition, on May 5, 2009, the Trustee filed a motion to reject certain contracts,

including the Salty Fare lease agreement with CFT.  MCI filed no objection or response, and the

Court granted the Trustee's motion on June 2, 2009.  The Court agrees with CFT that the

Trustee's motion and MCI's failure to respond offers further evidence that the sale did not

materially impact the Club operations or facilities.

Accordingly, the Court concludes there is no genuine issue of material fact and that the

transfer of Salty Fare to CFT did not have a material impact on the facilities and operations of

the Club and was therefore valid under the terms of the Transfer Agreement.

## ii.  Beach II, Beach III, Easter Beach, Ocean Front, and Pensco

These parties similarly argue their interests are not subject to MCI's rights because the

transfers of the portions of Property owned by Beach II and Beach III, on which Easter Beach,

Ocean Front, and Pensco hold mortgages, were sales in the ordinary course of Debtor's business

of real estate development and were made to finance Debtor's ongoing operations, which did not

materially impact the facilities or operation of the Club.  Relying on the deposition testimony of

the Dixons, these parties argue that the transfers of the beach cottages represented a small and

selective portion of Debtor's property and not substantially all of its assets.  Furthermore, these

parties state that the transfers did not negatively impact the services or benefits to MCI members, but rather, allowed for financing in order to renovate and refurbish the beach cottages that benefitted MCI, Club members, and the ongoing operations of Debtor.  These parties also note that the cottages were placed into the rental pool for MCI and others to rent.

MCI points to William Dixon's deposition testimony that the beach cottages were quit claimed from Debtor all at one time and argues this was a bulk transfer of property and not in the ordinary course of business.  MCI also asserts that these defendants had record notice of the potential reconveyance right.

After considering the allegations and factual support submitted by the parties, the Court finds that summary judgment should be granted to Beach II, Beach III, Easter Beach, Ocean Front, and Pensco on this ground.  Even viewing the evidence in the light most favorable to MCI, the Court does not find any genuine issue of material fact to suggest the transfers of property to Beach II and Beach III violated the assignment of assets provision in Section 14.1.6.  More specifically, the evidence shows that the transfers, even if they included a large grouping of cottages, were not sales of substantially all of the assets and were made in the ordinary course of business.  Furthermore, the Court has been presented with no evidence to contradict the Dixons' deposition testimony that the sales created some benefits for MCI, the Club members, and Debtor, but did not otherwise materially impact the Club operation and facilities.  Although MCI board member Richard Silver testified that his understanding was that the cottages were no longer available for rental at the same favorable price to MCI members after the transfers, this testimony was admittedly uncertain and provided no specific information as to a change in rental fee, or how any change had a negative effect on any MCI members. Accordingly, summary judgment is granted on this issue.

### iii.  **Effect of the Sales to CFT, Beach II, and Beach III**

As stated, Section 14.1.6 addresses both sales of substantially all of the assets and sales of portions of the assets, the latter of which may be accomplished without MCI's consent so long as the sale is made in the ordinary course of business and does not materially impact the facilities or operation of the Club.  For the reasons described above, the Court finds that the transfers of portions of the Property to CFT, Beach II, and Beach III complied with and were therefore valid pursuant to the terms of Section 14.1.6.  As this Court has previously found, Article 5 and the recorded Memorandum created an affirmative covenant running with the land, which the parties intended would bind any succeeding operator of the Club and Club facilities as a whole.  This reading reconciles with the language of Article 14.1.6, which required MCI's approval of a sale of substantially all of the assets unless it was to a buyer of the same or greater economic worth and with the experience, reputation, and ability to maintain the Club's related facilities.  In contrast, however, it is also logical that any purchaser acquiring a portion of the Property, the sale of which has no material impact on facilities or operations, would escape the responsibilities of the affirmative covenant.  The purchaser of such portions of Property would not be an owner or operator of the Club facilities, and therefore, would have no ability to meet such obligations under Article 5.  As a result, the Court finds that the portions of Property currently owned by CFT, Beach II, and Beach III are non-estate assets which were not intended to be nor are subject to the remaining Article 5 covenant and potential reconveyance right.

### **CONCLUSION**

Based on the foregoing analysis, the Court grants summary judgment to the Defendant moving parties on the following grounds:

(1) To date, Debtor has made no election under Article 5 of the Transfer Agreement, and the reconveyance right has not been triggered.

(2) The remaining Article 5 covenant is nullified based on a change of conditions and
public policy considerations.

(3) MCI's asserted interest is not superior to the interests of the Defendants asserting
liens on bankruptcy assets or non-bankruptcy assets pursuant to the Transfer
Agreement or Memorandum of Agreement.

(4) The transfers of property to CFT, Beach II, and Beach III were valid under Section
14.1.6, and thus, MCI's asserted interest is not superior to the interests of CFT, Beach
II, Beach III, or any Defendant asserting a lien on the property owned by those
entities.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**06/30/2010**



_John E Waites_

Chief US Bankruptcy Judge
District of South Carolina

Entered: 06/30/2010